**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINE O'REILLY, | Civil Case No.    24-cv-5913 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ICAP CORPORATES LLC, TP ICAP GROUP PLC, TP ICAP BROKING LIMITED, TP ICAP MARKETS LIMITED, CITIGROUP INC., CITIGROUP GLOBAL MARKETS LIMITED, and JANIE MCCATHIE, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff Christine O'Reilly ("Plaintiff" or "Ms. O'Reilly"), by and through her undersigned attorneys, Redniss LLC and Brankov PLLC, for her Complaint against defendants ICAP Corporates LLC ("ICAP NY"), TP ICAP Group plc ("ICAP Group Parent"), TP ICAP Broking Limited ("ICAP Broking UK"), TP ICAP Markets Limited ("ICAP Markets UK") (collectively, "ICAP" or the "ICAP Defendants"), Citigroup Inc., Citigroup Global Markets Limited ("CGML UK") (Citigroup Inc. and CGML UK, together, "Citi" or the "Citi Defendants") and Janie McCathie (all defendants collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      This case exposes a toxic alliance between ICAP, a leading interdealer broker, and Citi, a major global bank. It reveals how unethical traders at powerful financial institutions exploit control over lucrative order flows to extract inappropriate personal favors from brokers.

2.      For four years, Christine O'Reilly, an ICAP broker, was ensnared in a corrupt partnership involving her supervisor, Janie McCathie, and a high-value Citi trader, Benjamin Waters. This collusion subjected Ms. O'Reilly to relentless, coordinated harassment, jeopardizing

her career and well-being to maintain ICAP's relationship with Citi, because, as Ms. McCathie wrote on September 15, 2023, Mr. Waters had "done 4 yards [$4 billion] with us this expiry."

3.      Despite public pledges to ethical business practices and stringent Codes of Conduct, Citi's and ICAP's actual work culture prioritizes relationship-building through alcohol-fueled socializing and off-channel communications. This contrast between stated values and real practices fosters an environment where misconduct thrives unchecked, with participants sidestepping regulatory scrutiny through unauthorized channels, rendering official policies window dressing.

4.      After a decade at ICAP, and as one of the few women on the New York desk, Ms. O'Reilly reached a glass ceiling she could not break, trapped between maintaining a profitable client relationship and preserving her integrity. Her own supervisor, Ms. McCathie, saw an opportunity to coerce Ms. O'Reilly into submitting to unwanted sexual advances as a means to secure millions in Citi business.

5.      On February 21, 2024, after years of corrosive conditions, Ms. McCathie humiliated Ms. O'Reilly on a recorded line, telling her "to go fuck yourself." This incident marked Ms. O'Reilly's tipping point.

6.      She filed a formal complaint on March 5, 2024, detailing how, for years, quid pro quo harassment had been disguised as a business practice, including:

- how high-value traders leverage order flows to perpetrate sexual harassment against brokers;

- how sexual misconduct can become a currency in quid pro quo arrangements where abuse tolerance is exchanged for business;

- how lax off-channel communication policies enable misconduct through systemic compliance failures; and

- how institutional negligence and retaliation against whistleblowers reveal a culture of complicity, where leadership ignores abuse and punishes reporters.

7.      On April 23, 2024, ICAP Group CEO Nicolas Breteau was notified of Ms. O'Reilly's claims and ongoing retaliation, including attempts to force her resignation and a sham investigation. Despite Ms. O'Reilly's career-long dedication to ICAP, not a single member of management has inquired about her well-being since she filed her internal complaint. The Defendants' ongoing efforts to conceal these industry practices underscore the urgent need for reform in corporate culture, compliance, and employee protection.

## NATURE OF CLAIMS

8.      Plaintiff seeks declaratory, injunctive, and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"); and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq. ("NYCHRL").

9.      Plaintiff also brings claims for negligence against the Citi Defendants for the failure to properly supervise Mr. Waters, enforce policies, and prevent his misconduct.

## ADMINISTRATIVE PROCEDURES

10.      On July 12, 2024, O'Reilly filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

11.      On July 16, 2024, the EEOC issued Plaintiff a Notice of Right to Sue.

12.      This Complaint is being filed within 90 days of the issuance of Plaintiff's Notice of Right to Sue.

13.      Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office

of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of this action.

14.    All other prerequisites to the filing of this lawsuit have been met.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims that they form part of the same case or controversy.

16.    This Court has personal jurisdiction over all Defendants. The ICAP Defendants and Citi Defendants conduct substantial business in New York, maintain offices in New York, and the unlawful conduct giving rise to this action occurred in and/or was directed at New York. Defendant McCathie's conduct was directed at and had a substantial impact on Plaintiff's employment in New York.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

18.    Plaintiff Ms. O'Reilly resides in New York County. At all relevant times, Ms. O'Reilly was, and is, an "employee" of the ICAP Defendants within the meaning of all applicable statutes.

19.    Defendant ICAP NY is a Delaware limited liability company with its principal place of business at 200 Vesey Street, New York, NY 10281. At all relevant times, ICAP Corporates was Ms. O'Reilly's "employer" within the meaning of all applicable statutes.

20.    Defendants ICAP Broking Limited and ICAP Markets Limited are, upon information and belief, entities organized under the laws of laws of England and Wales, United Kingdom that employ or employed Janie McCathie, exercise control over her conduct and are responsible for her actions in relation to Ms. O'Reilly.  Their principal place of business is located at 135 Bishopsgate, London, EC2M 3TP, United Kingdom.

21.    Defendant ICAP Group Parent is a public limited company organized under the laws of England and Wales with its principal place of business at 135 Bishopsgate, London EC2M 3TP, United Kingdom. ICAP Group Parent exercises control over the employment policies and practices of its subsidiaries, including ICAP NY, ICAP Broking Limited and ICAP Markets Limited, and is therefore an "employer" within the meaning of all applicable statutes.

22.    The ICAP Defendants operate as a single integrated enterprise with respect to their employees, including Ms. O'Reilly and Ms. McCathie. They share common management, ownership and policies as well as interrelated operations. As such, they should be considered a single employer for the purposes of this action. ICAP NY's Employee Handbook states that the "TP ICAP Group maintains a Global Code of Conduct . . . [e]ndorsed by TP ICAP plc Board of Directors . . ."

23.    Defendant Citi, a Delaware corporation with its principal place of business at 388 Greenwich Street, New York, NY 10013, exercises control over the employment policies and practices of its subsidiaries, including CGML UK.

24.    Defendant CGML UK, headquartered in London, is Citi's international broker dealer, with an address of Citigroup Centre, 33 Canada Square, London, E14 5LB, United Kingdom. CGML UK regularly interacts with ICAP NY and was directly involved in the events

giving rise to this case. CGML UK certified Mr. Waters as "fit and proper" with the UK Financial Conduct Authority and exercised control over his conduct.

25.    Citi and CGML UK operate as a single integrated enterprise with respect to their employees, including Mr. Waters. Upon information and belief, they share common management, ownership and interrelated operations. As such, they should be considered a single employer for the purposes of this action.

26.    Defendant Janie McCathie is an individual residing, upon information and belief, in the United Kingdom. At all relevant times, she was employed by one or more of the ICAP Defendants and served as Ms. O'Reilly's supervisor.

27.    Benjamin Waters, although not named as a defendant in this action, was at all relevant times an employee of CGML UK. Mr. Waters acted as a non-party co-conspirator and aider and abettor to the unlawful conduct alleged herein.

## FACTUAL ALLEGATIONS

### Background and Early Career at ICAP (2013-2018)

28.    Ms. O'Reilly started as an intern at ICAP NY in 2013.

29.    In recognition of her exceptional performance, ICAP offered Ms. O'Reilly a full-time position, which she accepted, starting in August 2014.

30.    From August 2014 to early 2015, Ms. O'Reilly excelled in ICAP's new hire rotation program.

31.    In early 2015, Ms. O'Reilly joined the Listed Options equities desk, becoming the most active junior broker in trade breakdowns.

32.    In December 2017, Ms. O'Reilly advanced to broker on ICAP's Delta One MSCI desk, eventually heading the MSCI business in New York. She reports to Alex Lynch and Ray

Fisher in New York, Janie McCathie (desk head at the Delta One MSCI desk in London) and James Gilbert (senior managing director).

33.    Ms. O'Reilly and Ms. McCathie work closely together, with Ms. McCathie controlling Ms. O'Reilly's compensation through discretionary allocation of trade commissions.

**The Development of a Toxic Work Environment (2018-2020)**

34.    Ms. O'Reilly's new position necessitated frequent interactions with London colleagues and clients, primarily equity traders at major banks like Citi, which is known to have one of Wall Street's biggest Delta One books.

35.    Since at least 2019, ICAP brokers have relied on WhatsApp chat groups as the primary communication method for daily business, despite corporate policies prohibiting this.[1]

36.    Senior ICAP personnel run these chat groups, making it almost impossible for some brokers to work without using WhatsApp. As noted in paragraph 119 *infra*, Ms. O'Reilly was removed from these chat groups in retaliation after she internally reported the misconduct described herein.

37.    ICAP's work culture emphasized relationship-building through after-hours socializing, where heavy alcohol consumption was expected and encouraged, creating an environment ripe for abuse.

38.    Communication during and after these events with clients and colleagues routinely occurred through personal devices and messaging platforms, mostly WhatsApp.

---

[1] Members of ICAP's Delta One desk rely on two named WhatsApp chat groups for day-to-day business: "ICAP LDN/NY," consisting of nine brokers, and "MSCI Mates," with five brokers including Janie McCathie, Danielle Orme and Ms. O'Reilly. In the past few years, MSCI Mates has been the most active because the members work closely together.

39.     During a 2018 or 2019 work trip, Ms. O'Reilly first met Benjamin Waters, a trader at Citi's Delta One MSCI desk in London, while he was dining with Ms. McCathie.

40.     Mr. Waters provided ICAP and Ms. McCathie access to Citi business, enabling her, upon information and belief, to personally earn millions of dollars per year in compensation.

41.     By early 2020, Mr. Waters had developed an inappropriate personal interest in Ms. O'Reilly.

42.     On February 13, 2020, during a London work event at the Ned, Mr. Waters escalated his inappropriate behavior by making sexual comments to Ms. O'Reilly. After the event, he insisted on coming back to her hotel at the Montcalm Royal London House to "have more drinks" and attempted to enter her hotel room, despite her explicit refusal.

**Escalation of Harassment and the Waters-McCathie Alliance (2020-2023)**

43.     From 2020 to 2023, Ms. McCathie and Mr. Waters played on Mr. Waters' interest in Ms. O'Reilly to maximize business between ICAP and Citi.

44.     Ms. McCathie pressured Ms. O'Reilly to tolerate Mr. Waters' harassment, framing it as part of the job. Mr. Waters exploited his position as an influential client to continue his abusive behavior, knowing ICAP would prioritize his business over Ms. O'Reilly's well-being.

45.     Throughout 2020 and 2021, Mr. Waters persistently used WhatsApp to harass Ms. O'Reilly, sending inappropriate late-night messages, frequently while intoxicated, asking for photos and attempting to arrange private meetings.

46.     On October 9, 2020, Mr. Waters messaged Ms. O'Reilly stating: "I'm hammered right now lol".

47.     On or about December 12, 2020, Mr. Waters asked Ms. O'Reilly on Instagram what she was wearing (Exhibit A).

48. Ms. O'Reilly forwarded these messages to her supervisor, Ms. McCathie, and a colleague, seeking support and intervention.

49. Ms. O'Reilly consistently rebuffed Mr. Waters' advances and reported his behavior to Ms. McCathie.

50. Instead of providing protection, Ms. McCathie expected Ms. O'Reilly to tolerate and flirt with Mr. Waters to maintain the business relationship with Citi.

51. Ms. McCathie told Ms. O'Reilly "you need to play the game" – tying her career to enduring harassment.

52. Ms. McCathie herself participated in the harassment, making sexual comments and criticizing Ms. O'Reilly for not being "fun" or "flirty" enough.

53. Mr. Waters leveraged Citi's valuable business to demand inappropriate access to Ms. O'Reilly.

54. Mr. Waters continued sending inappropriate messages and video calling Ms. O'Reilly at work. When rebuffed, he reminded her of his power as a client with remarks like "how can you be working because I am not busy."

55. By 2021, Mr. Waters punished Ms. O'Reilly's rejections by threatening to stop Citi's business with ICAP.

56. On April 9, 2021, Mr. Waters falsely accused Ms. O'Reilly of lying about a trade, threatening the Citi business, writing "…a line out irons out all the kinks…"

57. Ms. O'Reilly reported Mr. Waters' threat to Ms. McCathie, who instructed Ms. O'Reilly to apologize to Mr. Waters.

58.    On or about April 14, 2021, Ms. O'Reilly reported Mr. Waters' threats and disturbing conduct to Mr. Waters' supervisor, Bhavin Parikh, calling him on his personal phone. Mr. Parikh assured Ms. O'Reilly that he would take care of the problems with Mr. Waters.

59.    In early June 2021, Mr. Waters repeatedly called and messaged Ms. O'Reilly during a trip to Miami, complaining that she wasn't answering him and demanding that she respond and send photos. When Ms. O'Reilly sent a selfie of her and a friend at dinner, Mr. Waters replied, "no lol not pics like that." Ms. O'Reilly, feeling disturbed by these messages, deleted them.

60.    In June 2021, Mr. Waters spread false rumors that he was having a sexual relationship with Ms. O'Reilly. As a result, she was mocked by colleagues and forced to deny it.

61.    Mr. Waters continued his harassment through 2021, including on November 5, 2021, when he sent Ms. O'Reilly a series of messages despite receiving no response (Exhibit B).

62.    By December 2021, Ms. O'Reilly's work performance and health suffered, requiring therapy and medication for depression and anxiety caused by the constant work-related stress.

63.    Mr. Waters' harassment continued through 2022, with inappropriate messages and early morning video calls that Ms. O'Reilly would ignore, screenshot, and share with Ms. McCathie and others. Mr. Waters would also frequently call the ICAP/Citi phone line asking for Ms. O'Reilly or inquiring about her whereabouts in order to flirt with her.

64.    On May 26 2022, Ms. McCathie and Mr. Waters jointly harassed Ms. O'Reilly when they were out drinking together.

65.    After not getting a response, Mr. Waters wrote: "What. So you're ignoring me and lined me out......."

66.    Ms. McCathie even once left her phone with Mr. Waters (Exhibit C).

67.     In mid-July 2022, Ms. O'Reilly asked to be removed from the Citi chat, explaining to Ms. McCathie that she did not want to have any further contact with Mr. Waters.

68.     Ms. McCathie refused, reiterating that Ms. O'Reilly had to "play the game."

69.     Mr. Waters continued his offensive contact, often mixing personal and business communications.

70.     As one example, on November 22, 2022, messaging in the main Bloomberg chat with Citi, Mr. Waters threatened that if Ms. O'Reilly did not complete his order, he would stop doing business with ICAP until March 2023.

71.     Simultaneously, he messaged Ms. O'Reilly on WhatsApp, demanding that she "Get it done."

72.     On January 31, 2023, Mr. Waters tried to arrange a meeting outside of work with Ms. O'Reilly in New York.

73.     On February 11, 2023, Mr. Waters shared almost nude photos of another Citi employee that he claimed he was dating. He later sent Ms. O'Reilly a photo of this woman wearing nothing but a bra.

74.     That night, Ms. O'Reilly was told by a trader at Goldman Sachs that Mr. Waters had been expelled from the recent OTCEX event for inappropriate behavior toward a female broker.

**Retaliatory Commission Allocations**

75.     ICAP's compensation structure allowed Ms. McCathie to control Ms. O'Reilly's income, a power imbalance that forced Ms. O'Reilly to maintain a positive relationship with Ms. McCathie despite harassment.

76.    Ms. O'Reilly primarily covers New York market makers, who typically do not pay commissions in this business. Ms. McCathie covers banks in London, the primary source of orders for MSCI Futures and who do pay commissions. Most trades involve a U.S. market maker versus a London bank, resulting in split brokerage between Ms. O'Reilly and Ms. McCathie.

77.    This compensation structure created a power imbalance that Ms. McCathie exploited to control Ms. O'Reilly's role and income:

- Ms. McCathie had the authority to allow Ms. O'Reilly to participate in more chats with her customers and to split commissions on London-versus-London trades.

- For the few bank customers Ms. O'Reilly covered in New York, Ms. McCathie demanded to be added to their chats to maintain control.

- If Ms. O'Reilly did not immediately comply, Ms. McCathie would start a new chat that included herself.

- This arrangement effectively forced Ms. O'Reilly to maintain a positive relationship with Ms. McCathie, even if it meant tolerating harassment, in order to conduct business and earn income.

78.    Conflict with, or resistance to, Ms. McCathie could lead to lowered commissions for Ms. O'Reilly, as reflected in a July 6, 2023 discussion between the two about a commission split from Citi on WhatsApp.

79.    In multiple brokerage disputes, Ms. McCathie dismissed Ms. O'Reilly's concerns about unfair commission splits.

80.    In July 2023, when Ms. O'Reilly raised concerns about fairness, Ms. McCathie responded, "its fcking bull shit and bang out of order and ur so out of line but its clear how you operate."

81.    Despite these issues, Ms. O'Reilly was instructed by her supervisor, Alex Lynch, that her job was "to just make sure [Ms. McCathie] is happy."

**Ms. O'Reilly Blocks, Then is Forced to Unblock, Mr. Waters on Social Media**

82.    On July 26, 2023, Ms. O'Reilly blocked Mr. Waters on WhatsApp and restricted him on Instagram.

83.    On August 8, 2023, Ms. McCathie ordered her to unblock him, again tying her job to the need to tolerate sexual harassment.

84.    Once unblocked, harassment resumed and, on August 12, 2023, Mr. Waters sent Ms. O'Reilly a picture of him and Ms. McCathie out together, reminding Ms. O'Reilly of his perceived untouchable status (Exhibit D).

85.    At 2:16 am on Sunday, August 27, Mr. Waters sent a message, presumably while drunk, that read "lol Ofc ocoryse janpire."

86.    On September 14, 2023, Ms. O'Reilly posted a collage of pictures on her personal Instagram account, including a picture of her feet.

87.    Mr. Waters replied to Ms. O'Reilly's post via Instagram, writing "Nice feet." (Exhibit E).

88.    Ms. O'Reilly, at her breaking point, replied "What do you want Ben -- all constant messages no business? I cannot make it clear I do not give a fuck enough so....What?"

89.    Ms. O'Reilly immediately shared a screenshot of this interaction with Ms. McCathie and Ms. Danielle Orme (an ICAP colleague) in the MSCI Mates WhatsApp group, prompting an extensive discussion about how to assuage Mr. Waters and dissuade Ms. O'Reilly from reporting him to compliance (Exhibit F).

90.    In particular, Ms. McCathie forwarded a screenshot of Mr. Waters' message stating: "And I certainly will be reducing flow in light of that" – referring to Ms. O'Reilly's message.

91.    Ms. O'Reilly asked Ms. McCathie to send her a screenshot so that she could provide it to ICAP's compliance department, but Ms. McCathie refused, stating: "No I don't trust you anymore. I'm not screen shotting you anything."

92.    Ms. O'Reilly wrote: "I don't get why you protect him . . . I can take that and literally submit that . . . My message . . . .And his 700 unanswered ones. . . .To compliance".

93.    Ms. McCathie responded: "What is wrong with u . . . Are you trying to punish me . . . He's done 4 yards with us this expiry".

94.    Ms. Orme then drafted an apology for Ms. O'Reilly to send to Mr. Waters, which Ms. McCathie revised.

95.    At 2:58 am, Ms. McCathie further chastised Ms. O'Reilly: "I'm sorry he didn't do ZUL but I don't think you helped yourself in the run up by not playing the game. And if you don't help yourself -- it doesn't help us either."

96.    Ms. McCathie continued: "Am I ever gonna see an order from him now after that message? Will it impact our other shit? And you cannot categorically say no it won't."

97.    At 3:46 am, Ms. O'Reilly protested: "I think what he's doing is abuse."

98.    Ms. McCathie quickly replied: "Cor you are in the wrong here."

99.    Ms. McCathie then cautioned Ms. O'Reilly against reporting Mr. Waters, writing: "I'm getting less trades as a result of you and u want to go even further and report him to compliance . . . Do u understand what that does to me."

100.    Ms. O'Reilly then sent Ms. McCathie a recording of messages and calls from Mr. Waters that Ms. O'Reilly had not replied to.

101.    Ms. McCathie responded: "All you are showing me is him constantly contacting you, you not responding and then being surprised you are getting no Latam from him."

102.    Ms. McCathie was furious that Ms. O'Reilly would not send the apology she had drafted to Mr. Waters.

103.    Ms. McCathie's attempt to dissuade Ms. O'Reilly from reporting the harassment further contributed to the hostile work environment and constituted retaliation.

104.    Instead of reporting Mr. Waters, as required by ICAP Defendants' policies, Ms. McCathie met with Mr. Waters in person, apologizing for any "offense" caused by Ms. O'Reilly and begging him not to reduce the Citi business.

105.    As she subsequently confirmed by WhatsApp: "I've gone to see Ben this eve I've played a story He seems to feel bad for you And doesn't want me to cut you out [sic] chats."

106.    Ms. McCathie added: "My issue is I feel you will just go crazy at him if I say fine she is added back etc."

**Reporting and Retaliation (September 2023 – Present)**

107.    On September 20, 2023, Ms. O'Reilly reported Ms. McCathie's and Mr. Waters' years of harassment to Mr. Lynch and Mr. Gilbert.

108.    Visibly distressed and crying, Ms. O'Reilly explained that she could no longer tolerate Ms. McCathie's abuse and her insistence that Ms. O'Reilly endure Mr. Waters' relentless, inappropriate behavior.

109.    Ms. O'Reilly detailed how Ms. McCathie was facilitating Mr. Waters' abuse to secure more Citi business, and abusing Ms. O'Reilly directly.

110.    Mr. Gilbert assured Ms. O'Reilly that he wanted to retain her and would take appropriate action. Although Mr. Gilbert and Mr. Lynch were obligated to internally escalate Ms.

O'Reilly's complaint,[2] as he later admitted to Ms. O'Reilly in February 2024 when he told her that the "system is broken," upon information and belief, neither Mr. Gilbert nor Mr. Lynch took any action to address the situation.

111.    Instead, they required her to immediately resume working with Ms. McCathie on a daily basis.

112.    In or around the fourth quarter of 2023, female members of ICAP Group Parent's executive leadership, guided by Mr. Gilbert, toured the New York office where Ms. O'Reilly was working.  Upon observing that Ms. O'Reilly was one of a handful of women working on a floor with hundreds of men, they inquired about her experience as the one of the only females on the floor, yet took no action to investigate this gender imbalance.

113.    On February 21, 2024, Defendant McCathie publicly berated Ms. O'Reilly on the recorded NY/LDN hoot (phone line). Ms. McCathie told Ms. O'Reilly "to go fuck yourself," "do one," and called her "useless."

114.    Ms. McCathie then wrote in the ICAP London internal Bloomberg chat visible to all members of both the London and New York desks, that Ms. O'Reilly was "a joke" and "mental."

115.    Ms. O'Reilly left the office, informing her colleague Ben Kingham that she needed to report everything to Human Resources ("HR").

116.    Minutes later, at 10:52 am, Ms. McCathie sent a rambling WhatsApp message, in which she admitted saying "fuck off" while continuing to blame Ms. O'Reilly for having provoked her.  She then wrote "I love u."

---

[2] Page 11 of ICAP's Employee Handbook states: "If an employee is in a situation that he or she believes may violate or lead to a violation of the Code of Conduct, he or she should follow the procedures described therein."

117.    The following day, February 22, 2024, Ms. O'Reilly reported the years of harassment, including the September 2023 report to Mr. Lynch and Mr. Gilbert to ICAP's HR representative, Mattie Mohar.

118.    Ms. O'Reilly informed Ms. Mohar that she had preserved numerous messages from Defendant McCathie and Mr. Waters, and that additional evidence could be found on recorded lines and in Bloomberg chats.

119.    On February 26, 2024, in retaliation for her formal complaint, Ms. O'Reilly was removed from the "LDN/NY" and "MSCI Mates" WhatsApp group chats, cutting her off from the main internal communications channels essential to her trading activities.

120.    On March 4, 2024, Mr. Gilbert informed Ms. O'Reilly by phone that HR had no advice for her and presented two options: (1) return to her desk and navigate the "awkwardness" with Defendant McCathie, or (2) discuss a separation from the company. These options appeared designed to force Ms. O'Reilly's resignation and avoid a thorough investigation.

121.    On March 5, 2024, Ms. O'Reilly submitted a formal complaint (the "March Complaint") in accordance with ICAP's complaint procedure to Ms. Mohar and Mr. Gilbert, documenting the years of harassment she had endured.

122.    On March 11, 2024, Ms. O'Reilly received an email from Michelle Allison, an ICAP NY employee who identified herself as the factfinder for the investigation. Ms. Allison specifically inquired whether Ms. O'Reilly had experienced any retaliation. In response, Ms. O'Reilly directed Ms. Allison to the March Complaint, which explicitly mentioned retaliatory acts, including her removal from the "MSCI Mates" chat group. However, ICAP took no action to address the retaliation or otherwise accommodate Ms. O'Reilly's concerns.

123.    On March 19, 2024, Ms. Allison interviewed Ms. O'Reilly, informing her that it was the first interview she had conducted.

124.    A month later, on April 16, 2024, Ms. Allison scheduled a brief call with Ms. O'Reilly but refused to answer Ms. O'Reilly's basic questions about the investigation's scope, process, or timeline.

125.    Ms. Allison merely stated that once the remaining interviews were complete, an "assessment" stage would follow. She declined to provide an estimated timeline, explain the decision-making process or identify who would be involved in assessment stage. Before the call ended, Ms. Allison startled Ms. O'Reilly by requesting Mr. Waters' contact information.

126.    This request was particularly surprising. First, the information could easily have been obtained from multiple ICAP personnel, Ms. McCathie, in particular. More concerning was the fact that Ms. Allison, as the sole factfinder, had not contacted Mr. Waters, Ms. O'Reilly's harasser, to preserve evidence, including his WhatsApp and Instagram messages.

127.    As of August 5, 2024, nearly five months after Ms. O'Reilly filed her March Complaint, ICAP claims to still be in the fact-finding stage of an investigation with no end in sight.[3]

128.    The inadequate investigation appears designed to conceal the years of misconduct and further alienate Ms. O'Reilly from her colleagues, customers, and role. The response also seems intended to insulate the ICAP Defendants from any liability.  The inaction by ICAP Group

---

[3] During the entirety of this period, Ms. O'Reilly has been on an indefinite leave of absence due to protracted investigation. In April, she attempted to negotiate a return to a safe working environment, but ICAP's only proposal failed to include interim measures that would prevent further harassment and retaliation, including by Ms. McCathie, who, upon information and belief, has remained in her position at all times.

Parent demonstrates its direct involvement in perpetuating the hostile work environment and failure to address discrimination within its corporate structure.

129.    In recent weeks, ICAP, through Ms. Allison, resisted requests by Ms. O'Reilly to access to her work emails. Eventually, ICAP agreed to allow Ms. O'Reilly to search her emails on August 1, 2024, on the condition that Ms. Allision sit with her and supervise her searches to prevent Ms. O'Reilly from forwarding, printing or copying any evidence relevant to the March Complaint and the investigation.

**Systemic Failures in Oversight and Compliance**

130.    The harassment and discrimination Ms. O'Reilly experienced were enabled and exacerbated by systemic failures in oversight and compliance at both ICAP and Citi.

131.    Despite company policies prohibiting such use, both ICAP and Citi allowed and even encouraged the widespread use of unauthorized communication channels like WhatsApp.

132.    In 2022, Citi was fined $200 million by U.S. regulators for widespread unauthorized use of messaging platforms. The persistence of these "longstanding failures" in Citi's internal controls and compliance systems enabled Mr. Waters' abuse to continue unchecked.

133.    If anything, Mr. Waters' use of WhatsApp increased after this penalty.

134.    The toxic dynamic and use of personal devices for business and to extract inappropriate benefits gives people like Mr. Waters and Ms. McCathie an advantage, while stunting the careers of those who comply with firm policies.

135.    Upon information and belief, ICAP was not the only broker from whom Mr. Waters sought inappropriate favors with the promise of Citi business. According to Ms. McCathie, Mr. Waters had, on multiple occasions, asked brokers seeking Citi business to procure prostitutes for him and a second Citi colleague.

136.    The widespread use of unauthorized communication channels at both ICAP and Citi resulted in:

- Incomplete business records related to trades and other activities;

- Deletion or loss of evidence of misconduct;

- Inability to properly supervise employees and monitor communications; and

- Creation of an environment where employees felt emboldened to engage in inappropriate behavior without fear of detection.

137.    The parallel failures of both Citi and ICAP created an interconnected hostile work environment where Mr. Waters, as a Citi employee, could freely harass Ms. O'Reilly, an ICAP employee, with the knowledge and facilitation of ICAP senior management.

**Impact on Ms. O'Reilly's Career and Health**

138.    As a result of Defendants' unlawful conduct, Ms. O'Reilly has suffered significant harm to her career, including stunted professional growth, denied opportunities for advancement, and potential long-term damage to her industry reputation and future employment prospects.

139.    Ms. O'Reilly has also suffered severe emotional distress, requiring ongoing therapy and medication. The constant stress and anxiety have affected her overall quality of life, damaged personal relationships, and caused financial stress.

**FIRST CAUSE OF ACTION**
**Discrimination in Violation of Title VII**
**(Against ICAP Defendants)**

140.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

141.    The ICAP Defendants are employers within the meaning of Title VII.

142.    The cumulative effect of the harassment and discrimination Ms. O'Reilly experienced on the basis of her sex created a hostile work environment that was severe, pervasive, and altered the conditions of her employment.

143.    The hostile work environment included, but was not limited to, persistent unwanted sexual attention from Mr. Waters; pressure from Ms. McCathie to engage in and tolerate inappropriate behavior; use of profane and demeaning language towards Ms. O'Reilly; public humiliation and criticism; threats to Ms. O'Reilly's job security and compensation; isolation from essential work communications; failure of management to address reported issues and other verbal and physical conduct of a sexual nature by Ms. McCathie and Mr. Waters.

144.    This hostile environment was known to ICAP management, including Mr. Gilbert, who failed to take appropriate action to address it.

145.    The hostile work environment was so severe that it negatively impacted Ms. O'Reilly's mental health, requiring her to seek therapy and medication.

146.    The actions of Ms. McCathie and Mr. Waters, with the tacit approval of ICAP management, constituted quid pro quo harassment.

147.    Ms. O'Reilly was repeatedly told that her job performance, compensation, and continued employment were contingent on her willingness to tolerate Mr. Waters' inappropriate behavior and "play the game."

148.    Specific instances of quid pro quo harassment include Ms. McCathie's explicit statements tying Ms. O'Reilly's job to her relationship with Mr. Waters; Mr. Waters' threats to withdraw business if Ms. O'Reilly did not respond to his advances; the pressure to attend social events and engage in off-hours communication with Mr. Waters; and the allocation of accounts and commissions based on Ms. O'Reilly's willingness to tolerate harassment.

149.    The ICAP Defendants are liable for the acts of Mr. Waters, a non-employee, because they knew or should have known of his conduct and failed to take immediate and appropriate corrective action. The ICAP Defendants' ability to control Mr. Waters' conduct is

evidenced by their power to withhold business from Citi or to report Mr. Waters' conduct to Citi management.

150.    As a direct and proximate result of the ICAP Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

151.    As a direct and proximate result of the ICAP Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

152.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

## <u>SECOND CAUSE OF ACTION</u>
### Retaliation in Violation of Title VII
### (Against ICAP Defendants)

153.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

154.    Plaintiff engaged in protected activity under Title VII by complaining about and opposing the discriminatory conduct to which she was subjected.

155.    Following Ms. O'Reilly's formal complaints about the harassment and discrimination she experienced, ICAP engaged in retaliatory actions designed to punish her for speaking out and to force her resignation.

156.    These retaliatory acts include: removal from essential work communications channels; denial of access to work emails; pressure to return to work in a hostile environment or

accept separation; conducting a sham investigation designed to outlast Ms. O'Reilly rather than address her complaints; failure to provide updates on the progress of the investigation; and professional isolation through restricted access to work resources.

157.    The close temporal proximity between Ms. O'Reilly's protected activities (i.e., her complaints) and these adverse actions provides strong evidence of a causal connection and retaliatory intent.

158.    The ICAP Defendants' retaliatory actions were a direct result of Plaintiff's protected activities.

159.    As a direct and proximate result of the ICAP Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

160.    As a direct and proximate result of the ICAP Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

161.    Defendants' unlawful and retaliatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under Title VII.

### THIRD CAUSE OF ACTION
**Discrimination in Violation of NYSHRL**
**(Against All Defendants)**

162.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

163.    Defendants discriminated against Plaintiff on the basis of her sex by subjecting her to a hostile work environment that was severe and pervasive and that unreasonably interfered with

her work performance, including by failing to address and by facilitating harassment by a non-employee client, in violation of the NYSHRL.

164.    Defendants knew or should have known of the hostile work environment, including harassment by a non-employee client, and failed to take prompt and effective remedial action.

165.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, for which she is entitled to an award of monetary damages and other relief.

166.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, for which she is entitled to an award of monetary damages and other relief.

167.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of NYSHRL
### (Against All Defendants)

168.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

169.    Plaintiff engaged in protected activity under the NYSHRL by complaining about and opposing the discriminatory conduct to which she was subjected.

170.    Defendants retaliated against Plaintiff by, inter alia, removing her from essential work communications, denying her access to her work email, and attempting to force her resignation.

171.    Defendants' retaliatory actions were a direct result of Plaintiff's protected activities.

172.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages and emotional distress, for which she is entitled to an award of monetary damages and other relief.

173.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYSHRL.

## FIFTH CAUSE OF ACTION
### Discrimination in Violation of NYCHRL
### (Against All Defendants)

174.     Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

175.     Defendants discriminated against Plaintiff on the basis of her sex by subjecting her to a hostile work environment that interfered with her work performance, including by failing to address and by facilitating harassment by Mr. Waters, in violation of the NYCHRL.

176.     Defendants knew or should have known of the hostile work environment, including harassment by Mr. Waters, and failed to take prompt and effective remedial action.

177.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages and emotional distress, for which she is entitled to an award of monetary damages and other relief.

178.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYCHRL.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of NYCHRL
### (Against All Defendants)

179.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

180.    Plaintiff engaged in protected activity under the NYCHRL by complaining about and opposing the discriminatory conduct to which she was subjected.

181.    Defendants retaliated against Plaintiff by, inter alia, removing her from essential work communications, denying her access to her work email, and attempting to force her resignation.

182.    Defendants' retaliatory actions were a direct result of Plaintiff's protected activities.

183.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages and emotional distress, for which she is entitled to an award of monetary damages and other relief.

184.    Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless indifference to Plaintiff's protected rights under NYCHRL.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting Discrimination in Violation of NYSHRL and NYCHRL
### (Against All Defendants)

185.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

186.    Defendants, along with non-party co-conspirator Benjamin Waters, directly participated in the discriminatory conduct and aided, abetted, incited, compelled, and/or coerced the unlawful discriminatory conduct in violation of NYSHRL and NYCHRL.

187.    Defendant McCathie directly participated in the discriminatory conduct by repeatedly instructing Ms. O'Reilly to tolerate Mr. Waters' harassment, telling her to be "nicer" to him, and explicitly tying Ms. O'Reilly's job performance to her willingness to endure sexual harassment.

188.    As a direct and proximate result of Ms. McCathie's unlawful discriminatory conduct and aiding and abetting in violation of the NYSHRL and NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages and emotional distress, for which she is entitled to an award of monetary damages and other relief.

189.    As a direct and proximate result of Ms. McCathie's unlawful discriminatory conduct and aiding and abetting in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic damages and emotional distress, for which she is entitled to an award of monetary damages and other relief.

**EIGHTH CAUSE OF ACTION**
**Negligent Retention and Supervision**
**(Against Citi Defendants)**

190.    Plaintiff repeats and realleges all preceding paragraphs as if fully restated herein.

191.    Citi's role in this matter extends beyond the actions of a single employee.

192.    Multiple Citi personnel, including Mr. Parikh, were aware of Mr. Waters' misconduct.

193.    The Citi Defendants owed a duty of care to Plaintiff to prevent their employee, Mr. Waters, from using his position to sexually harass and discriminate against her.

194.    This duty arises from the relationship between Citi and Mr. Waters as employer and employee and the foreseeability of harm to brokers like Ms. O'Reilly with whom Mr. Waters regularly interacted as part of his job duties.

195.    The Citi Defendants had actual or constructive knowledge of Mr. Waters'
propensity to sexually harass and discriminate against women he professionally engaged with, and
tendency to leverage his position with Citi to promise future commissions to brokers in exchange
for personal favors, including procuring prostitutes.

196.    The Citi Defendants breached their duty by failing to properly supervise Mr. Waters
despite knowledge of his propensity for misconduct, failing to implement and enforce policies to
prevent harassment and off-channel communications, failing to take appropriate action when made
aware of Mr. Waters' misconduct, including inappropriate communications with Ms. O'Reilly,
threats to withhold business unless she complied with his demands, continuing to employ Mr.
Waters and giving him authority and access to brokers, including Ms. O'Reilly and continually
failing to adequately supervise him.

197.    The Citi Defendants' breach of duty was the proximate cause of Plaintiff's injuries.
Their failure to properly supervise Mr. Waters and prevent his misconduct directly led to the
harassment and discrimination Ms. O'Reilly endured. As a direct and proximate result of the Citi
Defendants' negligence, Plaintiff has suffered and continues to suffer monetary and/or economic
damages and emotional distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against
Defendants, containing the following relief:

A.  A declaratory judgment that the acts and practices complained of herein violate the
    laws of the United States, the State of New York, and the City of New York;

B.  An injunction and order permanently restraining these violations;

C.  Directing Defendants to take affirmative action as is necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff or any other individual;

D.  An award of damages to place Ms. O'Reilly in the position she would have occupied but for Defendants' discriminatory treatment, and making her whole for all the earnings and benefits she would have received but for defendant's discriminatory treatment, including, but not limited to, wages, bonuses, commissions, and other lost benefits;

E.  An award of compensatory damages, including damages for loss of earning potential, emotional distress, humiliation, and pain and suffering;

F.  An award of punitive damages for Defendants' willful and/or reckless disregard of Ms. O'Reilly's rights;

G.  An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law, and interest at the maximum allowable rate; and

H.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein and so triable.

Dated: August 5, 2024
       New York, New York             Respectfully submitted,

**REDNISS LLC**

By                  
        Seth Redniss

375 Greenwich Street
New York, New York 10013
Tel: (212) 334-9200
sredniss@redniss.com

BRANKOV PLLC
Amelia K. Brankov
1185 Avenue of the Americas, 3rd Fl.
New York, New York 10036
Tel: (212) 982-1231
abrankov@brankovlaw.com

*Counsel for Plaintiff*