UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHRISTINE O'REILLY,<br><br>                              Plaintiff,<br><br>                    -v.-<br><br>TP ICAP GLOBAL MARKETS AMERICAS LLC; TP ICAP GROUP SERVICES LIMITED; CITIGROUP INC.; CITIGROUP GLOBAL MARKETS LIMITED; JANIE MCCATHIE; and CITIBANK, N.A.,<br><br>                              Defendants. | 24 Civ. 5913 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Christine O'Reilly brought this action against several defendants — including TP ICAP Global Markets Americas LLC ("TPIGMA"),[1] as well as Citigroup Inc. ("Citigroup"), Citigroup Global Markets Limited ("CGML"), and Citibank, N.A. ("Citibank") (collectively, "Citi" or the "Citi Defendants") — seeking redress for injuries that Plaintiff allegedly suffered from a toxic work environment. In her operative complaint, the First Amended Complaint (the "FAC"), Plaintiff alleges ten causes of action under federal, state, and city statutes and the common law. Before the Court are (i) the Citi Defendants' motion to dismiss all six causes of action against them under Federal Rules of Civil Procedure 8(a), 12(b)(2), and 12(b)(6) and (ii) TPIGMA's partial motion to

---

[1]    After Plaintiff filed her initial complaint, ICAP Corporates LLC changed its name to TP ICAP Global Markets Americas LLC ("TPIGMA"). The Court refers to the entity by its new name and directs the Clerk of Court to modify the caption accordingly.

dismiss Plaintiff's ninth and tenth causes of action against it under Rule 12(b)(6).  For the reasons set forth below, the Court grants both motions.

**BACKGROUND**[2]

## A.    Factual Background

### 1.    Plaintiff's Early Career at TPIGMA

During the relevant time period, Plaintiff worked for TPIGMA, an interdealer brokerage firm with its principal place of business in New York City. (FAC ¶¶ 1, 29-30).  TPIGMA is a subsidiary of a public limited company organized under the laws of England and Wales, with its principal place of business in London.  (*Id.* ¶ 33).  Plaintiff first joined TPIGMA as an intern in 2013 and then accepted a full-time position starting the following year.  (*Id.* ¶¶ 60-61).

In 2017, Plaintiff became a broker on TPIGMA's Delta One MSCI desk. (FAC ¶ 64).[3]  The desk comprised TPIGMA personnel across multiple time

---

[2]    This Opinion draws its facts from the First Amended Complaint (the "FAC" (Dkt. #65)), the well-pleaded allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  The Court also relies, as appropriate, on the transcript of the November 26, 2024 pre-motion conference ("PMC Tr." (Dkt. #88)), and on certain of the exhibits attached to the FAC ("FAC, Ex. [ ]" (Dkt. #65)), each of which is incorporated by reference in the FAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that on a motion to dismiss, courts may consider documents incorporated by reference in or integral to a complaint).

For ease of reference, the Court refers to TPIGMA's memorandum of law in support of its partial motion to dismiss as "TPIGMA Br." (Dkt. #94); Citi's memorandum of law in support of its motion to dismiss as "Citi Br." (Dkt. #97); Plaintiff's combined memorandum of law in opposition as "Pl. Opp." (Dkt. #101); TPIGMA's memorandum of law in reply as "TPIGMA Reply" (Dkt. #102); and Citi's memorandum of law in reply as "Citi Reply" (Dkt. #103).

[3]    "Delta One products are financial derivatives that have no optionality and as such have a delta of (or very close to) one — meaning that for a given instantaneous move in the price of the underlying asset there is expected to be an identical move in the price of the derivative."  Ravi Kashyap, *Do Traders Become Rogues or Do Rogues Become Traders?*

2

zones to facilitate trades in the global markets, with key roles split between New York and London.  (*Id.* ¶¶ 43, 48).  Although Plaintiff was based in New York, she reported to and worked closely with Defendant Janie McCathie, who was head of the Delta One MSCI desk in London.  (*Id.* ¶¶ 64-65).  Ms. McCathie controlled Plaintiff's compensation, which was structured as a commission-based system, because Ms. McCathie had discretion over the allocation of trade commissions.  (*Id.* ¶¶ 49, 65).

In 2019, Plaintiff entered into an employment contract (the "Employment Agreement") with TPIGMA, under which she became a fixed-term employee with a base salary.  (FAC ¶ 66).  In December 2021, Plaintiff and TPIGMA entered into Amendment No. 1 to the Employment Agreement, which updated the terms of the contract through April 1, 2025, and which provided Plaintiff with a sign-on bonus of $100,000.  (*Id.* ¶ 100).

### 2.    Plaintiff's Worsening Work Environment

Plaintiff alleges that TPIGMA, its major client Citi, and Ms. McCathie fostered a toxic work culture.  (FAC ¶¶ 1, 15, 158, 224).  At TPIGMA, there was a "stark gender imbalance."  (*Id.* ¶ 52).  In addition, the firm's culture "emphasized relationship-building through after-hours socializing, where heavy alcohol consumption was expected and encouraged."  (*Id.* ¶ 70; *see also id.*

---

*The Om of Jerome and the Karma of Kerviel*, 2 Corp. & Bus. L.J. 88, 135 (2021).  "MSCI" is an acronym for Morgan Stanley Capital International, "an investment research firm that provides stock indexes, portfolio risk and performance analytics, and governance tools to institutional investors and hedge funds."  Will Kenton, *MSCI: What Does It Stand for and Its Importance*, Investopedia (last updated May 25, 2025), https://www.investopedia.com/terms/m/msci.asp.

¶¶ 3, 53). When Plaintiff chose not to participate in drinking-focused events, she was met with ridicule from her colleagues, who called her "bitchy" and "grumpy." (*Id.* ¶¶ 71-72). Additionally, Plaintiff found it difficult to maintain personal boundaries in her work environment. (*Id.* ¶ 73). Those difficulties were exacerbated by the use of WhatsApp chat groups, which were prohibited by official corporate policy, to conduct daily business. (*Id.* ¶¶ 68-69). According to Plaintiff, the frequent use of WhatsApp and social media blurred the lines between professional and personal communications and encouraged "inappropriate out-of-hours contact." (*Id.* ¶ 55).

During a work trip in 2018 or 2019, Plaintiff met Benjamin Waters, a high-value trader who worked on CGML's Delta One MSCI desk in London. (FAC ¶¶ 2, 75). Plaintiff alleges that, starting in early 2020, Mr. Waters behaved inappropriately toward her. (*Id.* ¶ 77). On February 13, 2020, Mr. Waters made sexual comments to Plaintiff at a work event in London and insisted on accompanying her back to her hotel, where Mr. Waters attempted to enter her hotel room despite her explicit refusal. (*Id.*). Mr. Waters's harassment continued from 2020 to 2023. (*See id.* ¶ 78). He frequently used WhatsApp and Instagram to harass Plaintiff, requesting photos, attempting to arrange private meetings, and video-calling Plaintiff both during and outside of working hours. (*Id.* ¶¶ 80-82, 89, 95, 101). On one occasion, Mr. Waters asked Plaintiff what she was wearing. (*Id.* ¶ 82 & Ex. B). On another occasion, when Plaintiff responded to Mr. Waters's request for photos with a selfie of herself at dinner with a friend, Mr. Waters responded, "no lol not pics like

that." (*Id.* ¶ 95).  Perhaps to illustrate his point, Mr. Waters later shared with Plaintiff "almost nude" photos of a Citi colleague whom he claimed to be dating. (*Id.* ¶ 117).  Mr. Waters also spread false rumors about engaging in a sexual relationship with Plaintiff, who was then mocked by her colleagues and forced to deny those rumors.  (*Id.* ¶ 96).

Plaintiff rebuffed Mr. Waters's numerous advances and reported his inappropriate behavior to Ms. McCathie.  (FAC ¶¶ 83-84).  Instead of addressing Plaintiff's concerns, however, Ms. McCathie told Plaintiff to "play the game" and endure Mr. Waters's harassment as part of her professional expectations.  (*Id.* ¶¶ 85-86).  Ms. McCathie even joined some of Mr. Waters's harassment, making sexual comments about Plaintiff, criticizing Plaintiff for not being "fun" and "flirty" enough, and repeating to Plaintiff that she had to "play the game."  (*Id.* ¶¶ 87, 103, 111).  Besides Ms. McCathie, Plaintiff also reported Mr. Waters's disturbing conduct to his supervisors at Citi, at least one of whom viewed it as a reason to remove Mr. Waters from his position.  (*Id.* ¶¶ 93, 106-108; *see also id.*, Ex. F).  Moreover, Mr. Waters's inappropriate behavior was not limited to Plaintiff.  In February 2023, he was expelled from an industry event for acting inappropriately toward another female broker.  (*Id.* ¶¶ 117-18).

According to Plaintiff, Mr. Waters retaliated against Plaintiff's rejections by threatening to stop Citi's business with TPIGMA, which in turn aggravated Plaintiff's working conditions at TPIGMA.  (FAC ¶¶ 90, 113; *see also id.*, Ex. H). Specifically, Ms. McCathie's concern about losing business caused her to direct

Plaintiff, repeatedly, to placate or reconcile with Mr. Waters.  For example, when Plaintiff blocked Mr. Waters on WhatsApp and restricted him on Instagram, Ms. McCathie told Plaintiff to unblock him, "tying her job to the need to tolerate sexual harassment." (*Id.* ¶¶ 128-129).  Later, when Plaintiff reacted strongly to Mr. Waters's continued harassment on social media, Ms. McCathie chastised Plaintiff, ordered her to apologize to Mr. Waters, and tried to dissuade Plaintiff from reporting Mr. Waters to compliance personnel.  (*Id.* ¶¶ 135, 139-150; *see also id.* ¶ 134 ("Ms. O'Reilly, at her breaking point, replied[ to Mr. Waters,] 'What do you want Ben — all constant messages no business?  I cannot make it clear I do not give a fuck enough so . . . What?'")).  Ms. McCathie told Plaintiff that Mr. Waters had "done 4 yards with [TPIGMA] this expiry," meaning $4 billion in a single expiry period, and complained that she was "getting less trades as a result of [Plaintiff]." (*Id.* ¶¶ 139, 145; Pl. Opp. 1).  Instead of reporting Mr. Waters herself or encouraging Plaintiff to do so, Ms. McCathie met with Mr. Waters in person to apologize for Plaintiff's behavior and "begg[ed] him not to reduce the Citi business."  (FAC ¶ 150).

### 3.    Plaintiff's Requests for Relief

In September 2023, Plaintiff reported "the years of harassment she had endured from Ms. McCathie and Mr. Waters" to Alex Lynch, Plaintiff's supervisor in New York, and James Gilbert, a senior managing director at TPIGMA.  (FAC ¶¶ 64, 153).  Because her updated Employment Agreement included a fixed term, which could require Plaintiff to return her signing bonus if she left TPIGMA before the completion of the term, Plaintiff expressed her

willingness to consider other positions within TPIGMA or to leave the industry altogether for graduate school if no alternative was available. (*Id.* ¶¶ 157-159). While Mr. Gilbert helped arrange one internal interview, it did not yield a successful outcome. (*Id.* ¶ 159). In the meantime, Plaintiff remained in her position and was forced to continue working with Ms. McCathie. (*Id.* ¶ 160). At some point between September 2023 and February 2024, Mr. Waters left CGML. (*See id.* ¶ 163).

By early 2024, Plaintiff made it clear to Mr. Lynch and others that she would leave TPIGMA if she could not be internally transferred to another position that did not require interactions with Ms. McCathie. (FAC ¶ 166). On February 21, 2024, Ms. McCathie publicly berated Plaintiff on a phone line between New York and London, telling Plaintiff "to go fuck [her]self" and calling her "useless." (*Id.* ¶ 169). Ms. McCathie also wrote in an internal Bloomberg chat visible to all members of the New York and London desks that Plaintiff was "a joke" and "mental." (*Id.* ¶ 170). The next day, on February 22, 2024, Plaintiff reported "the years of harassment" — as well as her September 2023 discussion with Mr. Lynch and Mr. Gilbert — to TPIGMA's Human Resources ("HR") representative. (*Id.* ¶ 173). Mr. Gilbert soon informed Plaintiff that she had two options: either return to her desk or discuss a separation from the company. (*Id.* ¶ 176). Plaintiff interpreted her options as a forced resignation. (*Id.*). In the meantime, Plaintiff was removed from the WhatsApp group chats used by her desk for internal communications, which chats were essential to her trading. (*Id.* ¶ 175).

On March 5, 2024, Plaintiff submitted a formal complaint to TPIGMA's HR Department. (FAC ¶ 177). In response, TPIGMA began a formal investigation and placed Plaintiff on a paid leave of absence. (*Id.* ¶¶ 178-184; *see also id.* ¶¶ 192-193, 202). Throughout the investigation, Plaintiff consistently expressed that her priority was to continue building her career at TPIGMA. (*Id.* ¶ 183). Concurrently, Plaintiff explored alternative options, including applying to graduate schools and sending her CV to a recruitment agency. (*Id.* ¶ 184). Nevertheless, Plaintiff emphasized as late as May 2024 that she had not committed to any graduate school or other opportunity and that she remained open to return to a safe working environment at TPIGMA. (*Id.* ¶ 191).

On July 12, 2024, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC"), which issued a Notice of Right to Sue four days later. (FAC ¶¶ 18-19). On August 12, 2024, without receiving any updates from the ongoing TPIGMA investigation, Plaintiff enrolled in law school. (*Id.* ¶ 196).

On September 23, 2024, HR informed Plaintiff that TPIGMA had concluded its investigation and found no "evidence of gender-based discrimination, harassment, or retaliation." (FAC ¶ 197). Four days later, on September 27, 2024, TPIGMA provided options for Plaintiff to return to work, including to her previous position, noting that the company was "willing to structure Ms. O'Reilly's role such that she [would have] no contact or interaction with Janie McCathie." (*Id.* ¶¶ 199-200). TPIGMA gave Plaintiff until

October 7, 2024, to return to work.  (*Id.* ¶ 201).  On September 30, 2024, TPIGMA terminated Plaintiff's paid leave, accusing Plaintiff of taking advantage of TPIGMA by enrolling in law school while on paid leave and demanding proof of withdrawal from a full-time law school program by October 4, 2024.  (*Id.* ¶¶ 202, 204).[4]

Plaintiff maintains that TPIGMA gave her a sham offer to return to work as a calculated strategy to avoid legal liability.  (FAC ¶ 213).  In support, Plaintiff contends that when she met with TPIGMA's HR representative to discuss the proposed no-contact arrangement, the representative was unable to answer basic questions.  (*Id.* ¶¶ 210-211).  What is more, no restructuring at the Delta One MSCI desk had taken place, and no one in the MSCI business had been informed of Plaintiff's potential return.  (*Id.* ¶ 212).  According to the FAC, Plaintiff has suffered "significant harm to her career" and "severe emotional distress" from the hostile work environment and sexual harassment that she endured while working at TPIGMA.  (*Id.* ¶¶ 222-225).

## B.    Procedural Background

### 1.    The Complaint and the FAC

Plaintiff filed this action on August 5, 2024.  (Dkt. #1).  Her initial complaint named three groups of defendants: (i) Plaintiff's employer, TPIGMA,

---

[4]    The FAC is imprecise about the status of Plaintiff's employment at TPIGMA.  (*See, e.g.*, FAC ¶¶ 12-13 (referring to TPIGMA's extension of a "sham job offer" during a meeting held on October 16, 2024, less than one week prior to the filing of the FAC)).  At the pre-motion conference held on November 26, 2024, counsel for TPIGMA indicated that Plaintiff was no longer employed by that entity because Plaintiff had terminated her employment contract in the summer of 2024.  (PMC Tr. 4).

and its corporate affiliates, including TP ICAP Group plc ("ICAP Group Parent"), TP ICAP Broking Limited ("ICAP Broking UK"), and TP ICAP Markets Limited ("ICAP Markets UK"); (ii) Mr. Waters's employer, the UK-based CGML, and Citigroup; and (iii) Ms. McCathie in her individual capacity.  (Dkt. #1 at 1, 4-6).

Between October 1 and October 2, 2024, Ms. McCathie, ICAP Group Parent, ICAP Broking UK, ICAP Markets UK, CGML, and Citigroup Inc. sought a pre-motion conference in anticipation of their respective motions to dismiss. (Dkt. #52-54).  TPIGMA answered Plaintiff's complaint on October 3, 2024. (Dkt. #56).  The Court granted the non-TPIGMA Defendants' requests for a pre-motion conference, which took place on November 26, 2024.  (November 26, 2024 Minute Entry).

Before the conference, on October 22, 2024, Plaintiff amended her pleadings and filed the First Amended Complaint.  (Dkt. #65).  The FAC added Citibank and TP ICAP Group Services Limited ("ICAP Group Services"; collectively with the other ICAP entities, "ICAP" or the "ICAP Defendants") as defendants and contained ten causes of action:

> (i)    discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17, against the ICAP Defendants;
>
> (ii)   retaliation in violation of Title VII against the ICAP Defendants;
>
> (iii)  discrimination in violation of the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 301, against all Defendants;
>
> (iv)   retaliation in violation of the NYSHRL against all Defendants;

      (v)    discrimination in violation of the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-134, against all Defendants;

      (vi)   retaliation in violation of the NYCHRL against all Defendants;

      (vii)  aiding and abetting discrimination in violation of the NYSHRL and NYCHRL against all Defendants;

      (viii) negligent retention and supervision against the Citi Defendants;

      (ix)   breach of contract against TPIGMA; and

      (x)    breach of the covenant of good faith and fair dealing against TPIGMA.

(FAC ¶¶ 226-294). The existing Citi entities, together with the newly added Citibank, renewed their request for a pre-motion conference in anticipation of their motion to dismiss. (Dkt. #79). The ICAP Defendants — including TPIGMA — also moved for a pre-motion conference in anticipation of their motion to dismiss. (Dkt. #81). Plaintiff responded to both requests. (Dkt #82-83). Ms. McCathie, however, withdrew her request to move to dismiss. (Dkt. #85).

### 2.    The Pre-Motion Conference and the Instant Motions

On November 26, 2024, the Court held a pre-motion conference with all parties. (November 26, 2024 Minute Entry; *see generally* PMC Tr.). During the conference, the Court detailed two concerns about Plaintiff's FAC, namely, the applicability of the single-integrated-enterprise theory to the ICAP and Citi entities, respectively, and the ability of the Citi entities to aid and abet violations of the NYSHRL and the NYCHRL as a group. (PMC Tr. 12-13). At

two different points in the conference, the Court offered to give Plaintiff another opportunity to amend her pleadings. (*Id.* at 16, 36-38). The Court explained that "after two rounds of pre[-]motion conference briefing and this conference," Plaintiff should "have a sense of what [her] adversaries are going to argue." (*Id.* at 37). Plaintiff's counsel responded that they "would like to have the opportunity to confer with [their] client" before deciding whether to further amend. (*Id.* at 39). The Court granted the request and asked Plaintiff's counsel to provide an update. (*Id.*).

Soon thereafter, the Court reviewed and approved a briefing schedule for all Defendants except for Ms. McCathie to file their motions to dismiss. (Dkt. #87). The Court also directed Ms. McCathie to answer the FAC within 14 days following its rulings on the various motions to dismiss. (*Id.*) Before the first briefs were due, Plaintiff and the ICAP Defendants filed a proposed stipulation and order dismissing Plaintiff's claims against ICAP Group Parent, ICAP Broking UK, and ICAP Markets UK with prejudice; allowing TPIGMA to file a partial motion to dismiss the ninth and tenth causes of actions in the FAC; and ordering ICAP Group Services to answer the FAC on the same timeline as that set for Ms. McCathie. (Dkt. #90). The Court endorsed the stipulation and issued the order. (Dkt. #92). Plaintiff did not otherwise amend her FAC.

On January 17, 2025, TPIGMA filed a partial motion to dismiss (Dkt. #93), and the Citi Defendants filed a full motion to dismiss (Dkt. #96). Plaintiff filed a combined memorandum of law in opposition on February 25, 2025.

(Dkt. #101).  TPIGMA and the Citi Defendants filed their respective reply
memoranda on March 18, 2025.  (Dkt. #102 (TPIGMA), 103 (Citi)).

## DISCUSSION

**A.    The Court Grants the Citi Defendants' Motion to Dismiss**

**1.    The Court Lacks Personal Jurisdiction over CGML**

As noted, the Citi Defendants move to dismiss Plaintiff's claims against
them — which comprise discrimination, retaliation, and aiding and abetting in
violation of the NYSHRL and the NYCHRL (Counts 3-7), and negligent retention
and supervision under the common law (Count 8) — under Rule 8(a) for
impermissible group pleading, Rule 12(b)(2) for lack of personal jurisdiction,
and Rule 12(b)(6) for failure to state a claim.  (*See generally* Citi Br.; Citi Reply).
"A court facing challenges as to both its jurisdiction over a party and the
sufficiency of any claims raised must first address the jurisdictional
question[s]."  *Lugones* v. *Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 234
(S.D.N.Y. 2020) (quoting *Cohen* v. *Facebook, Inc.*, 252 F. Supp. 3d 140, 148
(E.D.N.Y. 2017) (citing *Arrowsmith* v. *United Press Int'l*, 320 F.2d 219, 221 (2d
Cir. 1963))).  Accordingly, the Court begins its analysis by addressing the Citi
Defendants' Rule 12(b)(2) motion.

**a.    Applicable Law**

On a Rule 12(b)(2) motion, "the plaintiff bears the burden of establishing
that the court has jurisdiction over the defendant."  *DiStefano* v. *Carozzi N.
Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (internal quotation marks omitted)
(quoting *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779,

784 (2d Cir. 1999)). In addition, the "plaintiff must establish the court's jurisdiction with respect to each claim asserted." *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (alteration in original) (internal quotation marks omitted) (quoting *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)). "Where, as here, a court relies on pleadings and affidavits, . . . the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano*, 286 F.3d at 84. Moreover, the court construes those pleadings and affidavits "in the light most favorable to [the plaintiff], resolving all doubts in [the plaintiff's] favor." *Id.*

A district court deciding a motion to dismiss for lack of personal jurisdiction engages in a two-part analysis. *First*, it considers whether the law of the forum state — here, New York — provides a statutory basis for personal jurisdiction. *See Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013). *Second*, the court examines whether its exercise of personal jurisdiction "comports with due process protections established under the United States Constitution." *Id.* The parties in this case dispute whether the Court can exercise specific personal jurisdiction over the Citi Defendants under New York's long-arm statute, N.Y. C.P.L.R. § 302. (*See* Pl. Opp. 5-8; Citi Reply 3-4).[5] Ultimately, the Court finds that, under the relevant subsections of

---

[5]    Plaintiff does not argue that the Court has general jurisdiction over the Citi Defendants, nor could she successfully do so. A court's exercise of general jurisdiction under N.Y. C.P.L.R. § 301 requires that "a company has engaged in such a continuous and systematic course of doing business in New York that a finding of its presence in New York is warranted." *Sonera Holding B.V.* v. *Cukurova Holding A.S.*, 750 F.3d 221, 224

Section 302, Plaintiff has not carried her burden of establishing the Court's personal jurisdiction over her claims against CGML, the one Citi entity properly named as a Defendant in this case.

### b.    Analysis

#### i.    Citigroup and Citibank Are Not Proper Defendants

Before turning to the personal jurisdiction analysis, the Court first addresses whether all three Citi entities are properly named as Defendants.[6] To review, in addition to CGML, which employed Mr. Waters in London, Plaintiff also includes Citigroup and Citibank in her NYSHRL, NYCHRL, and negligence claims. She contends that the "Citi entities operate as a single integrated enterprise with respect to their employees, including Mr. Waters[,] and with respect to the Citi Delta One desk activities at issue in this case." (FAC ¶ 39). According to Plaintiff, all three entities "share common management, ownership[,] and interrelated operations," including "shared

---

(2d Cir. 2014) (per curiam) (internal quotation marks and brackets omitted) (quoting *Landoil Res. Corp.* v. *Alexander & Alexander Servs.*, 77 N.Y.2d 28, 33 (1990)). "Other than in 'exceptional case[s],' a corporation is 'at home' only in its state of incorporation and in the state of its principal place of business." *Al-Ahmed* v. *Twitter, Inc.*, 553 F. Supp. 3d 118, 125 (S.D.N.Y. 2021) (alteration in original) (quoting *Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014)); *accord Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014). CGML, the proper Citi entity in this case, is not incorporated in New York, which is also not its principal place of business. (*See* FAC ¶ 37).

[6]    The Court follows the example of other courts in this District in analyzing the single-integrated-enterprise theory for purposes of personal jurisdiction. *See Vista Food Exch., Inc.* v. *Champion Foodservice, L.L.C.*, No. 14 Civ. 804 (RWS), 2014 WL 3857053, at *7-8 (S.D.N.Y. Aug. 5, 2014) (declining to exercise personal jurisdiction over a defendant based on plaintiff's argument that it was the alter ego of another entity and that the two entities "operated as a single enterprise"); *Jayne* v. *Royal Jordanian Airlines Corp.*, 502 F. Supp. 848, 860 (S.D.N.Y. 1980) (establishing personal jurisdiction over a defendant that was so interrelated with another company that they "constitut[ed] a single enterprise for jurisdictional purposes").

responsibility for compliance and employee conduct across global operations."
(*Id.*).  Moreover, Plaintiff alleges that both CGML and Citibank certified Mr.
Waters to the Financial Conduct Authority ("FCA") in the United Kingdom.  (*Id.*
¶¶ 27, 42; Pl. Opp. 18).

In general, "[a]n employer-employee relationship is required to sustain a
claim under . . . the [NYSHRL] and the [NYCHRL]."  *Kilkenny* v. *Greenberg
Traurig, LLP*, No. 05 Civ. 6578 (NRB), 2006 WL 1096830, at *4 (S.D.N.Y.
Apr. 26, 2006); *accord Brown* v. *Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir.
2014); *McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 80 (S.D.N.Y.
2020) ("An essential element of a claim under the NYSHRL or the NYCHRL is
the existence of an 'employer-employee relationship.'" (quoting *Brown*, 756 F.3d
at 226) (collecting cases)).  In the FAC, Plaintiff makes clear that she was
employed by TPIGMA, and not by any of the Citi Defendants.  (*See* FAC ¶¶ 29-
34.)  However, she argues for liability on the part of the Citi Defendants based
on Mr. Waters's employment at CGML (*id.* ¶¶ 35-40, 42); as just noted, Plaintiff
alleges that all three Citi entities acted as a single integrated enterprise with
respect to Mr. Waters and the Citi Delta One MSCI desk (*id.* ¶ 39).  Similarly,
under New York law, a claim of negligent retention and supervision requires as
one of its elements that "the tortfeasor and the defendant were in an employee-
employer relationship."  *Doe* v. *Alsaud*, 12 F. Supp. 3d 674, 680 (S.D.N.Y.
2014) (internal quotation marks omitted) (quoting *Biggs* v. *City of New York*,
No. 08 Civ. 8123 (PGG), 2010 WL 4628360, at *9 (S.D.N.Y. Nov. 16, 2010)).
Mr. Waters, the alleged tortfeasor, was employed by CGML, and thus

negligence liability for Citigroup and Citibank would also have to be based on a single-integrated-enterprise theory.

To properly include Citigroup and Citibank as Defendants, neither of which directly employed Mr. Waters, Plaintiff "must establish that [those two entities were] part of an 'integrated enterprise' with the employer [CGML], thus making one liable for the illegal acts of the other." *Parker* v. *Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000). In the context of related corporate entities, the Second Circuit has adopted a four-part "single employer" or "single integrated enterprise" test. *Fried* v. *LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 2119748, at *3 (S.D.N.Y. May 23, 2011). Specifically, "parent[s] and subsidiar[ies] cannot be found to represent a single, integrated enterprise in the absence of evidence of [i] interrelation of operations, [ii] centralized control of labor relations, [iii] common management, and [iv] common ownership or financial control." *Id.* (quoting *Cook* v. *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240 (2d Cir. 1995)); *accord Jackson* v. *Total Relocation Servs., LLC*, No. 23 Civ. 4118 (KPF), 2024 WL 4850814, at *6 (S.D.N.Y. Nov. 21, 2024) (collecting cases). Of particular importance is the second element: it asks which entity or entities have control over employment matters that are relevant to the plaintiff's claims of discrimination. *Fried*, 2011 WL 2119748, at *3; *see also Murray* v. *Miner*, 74 F.3d 402, 404-05 (2d Cir. 1996) ("Although no one factor is determinative, . . . control of labor relations is the central concern."); *Mangahas* v. *Eight Oranges Inc.*, 754 F. Supp. 3d 468, 486 (S.D.N.Y. 2024) (same).

Plaintiff has not sufficiently alleged that CGML, Citigroup, and Citibank constitute a single integrated enterprise. Besides repeating the elements of the four-part test in paragraph 39 of the FAC, Plaintiff has not otherwise shown that Citigroup or Citibank played *any* part in CGML's employment matters, such as the hiring of Mr. Waters or control over the Citi Delta One MSCI desk and its interactions with third-party brokers. In addition, Citibank's certification of Mr. Waters to the UK-based FCA is insufficient to demonstrate that Citibank retained "centralized control of labor relations," which typically entails "tasks such as handling job applications, approving personnel status reporters, and exercising veto power over major employment decisions." *Parker*, 204 F.3d at 341. Plaintiff must "do more than simply state legal conclusions and recite the elements of the 'single employer' standard to survive a motion to dismiss." *Fried*, 2011 WL 2119748, at *5. She has not with respect to Citigroup and Citibank. Consequently, the Court conducts the personal jurisdiction analysis with respect to CGML, the only properly named Citi Defendant in this case.[7]

> ## ii. The Court Does Not Have Specific Personal Jurisdiction over CGML Under New York's Long-Arm Statute

Plaintiff argues that the Court has specific personal jurisdiction over CGML under all three subsections of New York's long-arm statute, which

---

[7]     Because the Court has dismissed Citigroup and Citibank under the single-integrated-enterprise theory, it does not reach the Citi Defendants' argument of impermissible group pleading under Rule 8(a). (*See* Citi Br. 11-12).

address CGML's business transactions in New York, its tortious acts within New York, and its tortious acts without New York that have caused injury within the state. *See* N.Y. C.P.L.R. § 302(a)(1)-(3). (Pl. Opp. 5-8). To support the Court's personal jurisdiction over CGML, Plaintiff primarily points to contacts between CGML and New York. (*See, e.g.*, FAC ¶ 27 (discussing CGML's "transactions with New York-based market makers and clients")). She also suggests that Mr. Waters's conduct as a CGML employee can be imputed to his employer. (*See id.* (alleging that CGML controlled Mr. Waters, whose conduct "was directed at and caused harm in New York"); *see also* Pl. Opp. 8 (arguing that CGML permitted Mr. Waters's misconduct to occur)). As explained in the remainder of this section, however, none of the three proffered bases supports personal jurisdiction over CGML in this case because (i) Plaintiff's claims do not arise from CGML's contacts with New York; (ii) Mr. Waters's conduct cannot be imputed to CGML; and (iii) Plaintiff has not otherwise argued for the Court's jurisdiction based on CGML's own conduct.

> **(a)** **Plaintiff's Claims Do Not "Arise From" CGML's Alleged Business Transactions in New York**

Under the first subsection of New York's long-arm statute, "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). The Court applies a two-prong test to evaluate this basis of jurisdiction: "[i] whether the defendant 'transacts any business' in New

York and, if so, [ii] whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (alteration in original) (quoting N.Y. C.P.L.R. § 302(a)(1)).

The "transacting business" prong requires the defendant to have undertaken a "purposeful activity" — that is, "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc.*, 490 F.3d at 246 (quoting *McKee Elec. Co.* v. *Rauland-Borg Corp.*, 20 N.Y.2d 377, 382 (1967)). Notably, "one purposeful transaction in New York is sufficient to trigger Section 302(a)(1)," making it a "single-act statute." *RV Skincare Brands LLC* v. *Digby Invs. Ltd.*, 394 F. Supp. 3d 376, 381 (S.D.N.Y. 2019). In addition, the second, "nexus" prong is satisfied "when there exists an articulable nexus or a substantial relationship between [business] transactions occurring within the state and the cause of action sued upon." *Spetner* v. *Pal. Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023) (quoting *Sunward Elecs., Inc.*, 362 F.3d at 23). Both prongs must be met for the Court to exercise jurisdiction over CGML under Section 302(a)(1). *See Lewis* v. *Samsung SDI Co. Ltd.*, No. 23 Civ. 6643 (KPF), 2025 WL 1826471, at *6 (S.D.N.Y. July 2, 2025).

Plaintiff argues that the Court has personal jurisdiction based on CGML's business transactions in New York because

> [i] CGML conducted large volumes of trades (including "4 yards" [or $4 billion] in a single expiry period) with New York market makers, [ii] these trades were brokered by Ms. O'Reilly and the related ICAP Defendants, and [iii] the claims directly arose from this

> New York-centered trading activity in connection with
> Mr. Waters'[s] conduct and the Citi Defendants' failure
> to properly supervise Mr. Waters and the Citi Delta One
> desk.

(Pl. Opp. 6 (citation omitted)).  In particular, Plaintiff contends that her claims

of harassment and discrimination "occurred in connection with that business

activity," including through trading-related communications between Plaintiff

and Mr. Waters as well as "off-channel communications and alcohol-fueled

socializing" to facilitate relationship building between CGML and TPIGMA.  (*Id.*

at 7; *see also* FAC ¶¶ 3, 88-89).

Assuming that CGML transacted business in New York, which CGML

does not dispute, Plaintiff's argument fails on the second prong.  While this

nexus requirement does not call for strict causation, Plaintiff's NYSHRL,

NYCHRL, and negligence claims do not bear sufficient "relatedness" to CGML's

alleged business activities in New York under Second Circuit precedent.  *See*

*Edwardo* v. *Roman Cath. Bishop of Providence*, 579 F. Supp. 3d 456, 475

(S.D.N.Y. 2022) ("*Edwardo I*"), *aff'd*, 66 F.4th 69 (2d Cir. 2023) ("*Edwardo II*").

To start, Plaintiff's NYSHRL and NYCHRL claims allege that all

Defendants discriminated against her "on the basis of her sex by subjecting her

to a hostile work environment" (FAC ¶¶ 250, 262); retaliated against her by

"removing her from essential work communications, denying her access to her

work email, and attempting to force her resignation and committing . . . post-

filing retaliatory acts" (*id.* ¶¶ 257, 268); and otherwise aided and abetted in the

discrimination (*id.* ¶ 273).  But CGML did not employ Plaintiff and had no

control over her work environment or her access to work communications at

TPIGMA.  As a non-employee, Plaintiff cannot rely on an employment relationship with CGML to argue for personal jurisdiction based on her own location in New York.  (*See* Pl. Opp. 7).  *Cf. Diaz-Roa* v. *Hermes L., P.C.*, 757 F. Supp. 3d 498, 524-25 (S.D.N.Y. 2024) (determining that plaintiff's claims arose out of her employment relationship with defendants, who approved of plaintiff's remote working in New York); *D'Anzieri* v. *Harrison Glob. LLC*, No. 21 Civ. 8506 (VEC), 2022 WL 17404254, at *4-5 (S.D.N.Y. Dec. 2, 2022) (same); *Xiaoyan Liu* v. *Canteen 82 Inc.*, No. 17 Civ. 7862 (KPF), 2018 WL 6067228, at *5-6 (S.D.N.Y. Nov. 20, 2018) (establishing personal jurisdiction based on defendants' joint employment of plaintiffs in New York).

Nor, in this instance, can Plaintiff rely on Mr. Waters's employment status.  As CGML correctly observes, "Mr. Waters's alleged harassment of Plaintiff . . . is indisputably outside the scope of his employment."  (Citi Br. 8). In other words, Mr. Waters may have been employed by CGML during the relevant period, but his conduct toward Plaintiff was unrelated to any trading with New York-based entities (like TPIGMA) that he did on behalf of CGML.  In *Edwardo I*, this Court explained that tort claims related to sexual abuse that the plaintiff suffered at the hands of a priest whom he accompanied on a business trip from Rhode Island to New York did not arise out of the church's business dealings in New York.  579 F. Supp. 3d at 475-76.  The Second Circuit agreed, adding that "the alleged [sexual abuse] took place at a separate location and at a separate time from the alleged business" meeting in New York and, more broadly, that "a chain of causation involving physical presence in

New York does not, by itself, create a nexus between an otherwise unrelated tort claim and a business transaction." *Edwardo II*, 66 F.4th at 76.

So too here.  Plaintiff's NYSHRL and NYCHRL claims are separate from Mr. Waters's work as a trader, even if they are part of a chain of causation involving the trading partnership between Plaintiff at TPIGMA and Mr. Waters at CGML.  At their core, Plaintiff's claims involve the personal sexual harassment that she endured from Mr. Waters, who (i) made sexual comments and attempted to enter Plaintiff's hotel room in London (FAC ¶ 77); (ii) constantly messaged and called Plaintiff on social media (*id.* ¶¶ 80-82, 89, 95, 101); (iii) spread rumors about a sexual relationship between himself and Plaintiff (*id.* ¶ 96); and (iv) threatened to stop giving business to Plaintiff in retaliation (*id.* ¶¶ 90, 113).  Tellingly, Plaintiff herself lamented that Mr. Waters was "all constant messages [and] *no business*."  (*Id.* ¶ 134 (emphasis added)). Despite Plaintiff's current assertion that the harassment was connected to CGML's business activities (Pl. Opp. 7), none of Plaintiff's allegations involving Mr. Waters demonstrates that such harassment took place as part of Mr. Waters's trading or CGML's official business in New York.

Moreover, Plaintiff's negligence claim, which alleges that CGML failed to "properly supervise Mr. Waters despite knowledge of his propensity for misconduct" and continued to employ Mr. Waters after it became aware of his misconduct, is also unrelated to any business transaction in New York.  (FAC ¶ 284).  Even the FAC acknowledges that CGML is a UK-based entity that employed Mr. Waters in the United Kingdom.  (*Id.* ¶¶ 37, 42).  Any negligence

on the part of Mr. Waters's employer would have taken place in the United

Kingdom, not in New York.  *See Edwardo II*, 66 F.4th at 75 (explaining that any

allegedly tortious conduct on the part of the church, which was based in Rhode

Island, "occurred entirely in Rhode Island").

### (b)    Mr. Waters's Conduct Cannot Be Imputed to CGML

Under the second and third subsections of New York's long-arm statute,

a court has personal jurisdiction over a defendant if, "in person or through an

agent," it "commits a tortious act [except for defamation] within the state," N.Y.

C.P.L.R. § 302(a)(2), or it "commits a tortious act [except for defamation]

without the state causing injury to person or property within the state," *id.*

§ 302(a)(3).  The third subsection contains an additional requirement that the

defendant "(i) regularly does or solicits business, or engages in any other

persistent course of conduct, or derives substantial revenue from goods used or

consumed or services rendered, in the state," or that it "(ii) expects or should

reasonably expect the act to have consequences in the state and derives

substantial revenue from interstate or international commerce."  *Id.*

§ 302(a)(3)(i)-(ii).

A court's jurisdiction extends to a defendant even if that defendant did

not commit the tort itself, as long as it "can be deemed responsible for such a

tort based upon theories of agency."  *LaChapelle* v. *Torres*, 1 F. Supp. 3d 163,

169 (S.D.N.Y. 2014).  Nevertheless, to be considered an agent of the defendant

under Section 302(a), the putative tortfeasor "must have acted 'for the benefit

of and with the knowledge and consent' of the non-resident principal[,] and the non-resident principal must have 'exercised some control over' the alleged agent." *Edwardo II*, 66 F.4th at 74 (quoting *Kreutter* v. *McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Plaintiff contends that personal jurisdiction over CGML is proper under Sections 302(a)(2) and 302(a)(3) because

> [t]he allegedly discriminatory conduct . . . was based on Mr. Waters'[s] communications and the Citi Defendants' interactions with Ms. O'Reilly in connection with New York-London trades authorized by the Citi Defendants[,] and [the discrimination] caused injury to Ms. O'Reilly in New York, where she worked and where the adverse employment actions occurred.

(Pl. Opp. 8). Plaintiff further contends that CGML was aware of Mr. Waters's misconduct but permitted it to occur. (*Id.* (citing FAC ¶¶ 93-94, 105-108, 161-163, 278-285)). Although Plaintiff does not explicitly argue an agency-based theory of liability, her arguments are most fairly read to seek to impute Mr. Waters's sexual harassment to his employer, CGML, and the Court will construe them in that manner for purposes of its personal jurisdiction analysis.[8]

The Court finds that Plaintiff has failed to allege that Mr. Waters acted "for the benefit of" CGML when he sexually harassed her. "New York courts

---

[8]    Plaintiff does not differentiate among her six claims against CGML, even though she bears the burden of establishing the Court's personal jurisdiction over each claim. The Court therefore treats her NYSHRL and NYCHRL claims of discrimination, retaliation, and aiding and abetting discrimination as claims of imputed liability based on Mr. Waters's conduct and discusses them here. It leaves the direct theory of negligence to the next section.

consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." *Edwardo II*, 66 F.4th at 74 (quoting *Swarna* v. *Al-Awadi*, 622 F.3d 123, 145-46 (2d Cir. 2010)); *see also, e.g.*, *Judith M.* v. *Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999) (determining that a hospital employee who was accused of sexually abusing a patient at the hospital "departed from his [job] duties for solely personal motives unrelated to the furtherance of the [h]ospital's business"); *Doe 1* v. *Cnty. of Rockland*, No. 21 Civ. 6751 (KMK), 2025 WL 945873, at *23 (S.D.N.Y. Mar. 28, 2025) ("Sexual assault and harassment 'is not in furtherance of [an employer's] business and is a clear departure from the scope of employment, having been committed for wholly personal motives.'" (citation omitted)). It is not enough that Mr. Waters engaged in sexual misconduct while in an employment setting. Rather, his "tortious act *itself* must benefit the principal in order for the principal to be deemed responsible for the tort based upon an agency theory." *Edwardo I*, 579 F. Supp. 3d at 470. Nowhere in the FAC — or in Plaintiff's opposition, for that matter — does Plaintiff describe the benefits that CGML derived from Mr. Waters's conduct. In short, even if the sexual misconduct took place on the job and during working hours, Mr. Waters "departed from his duties" and acted for his own personal benefit when he repeatedly harassed Plaintiff. *Judith M.*, 93 N.Y.2d at 933. Therefore, his conduct cannot be imputed to CGML for purposes of establishing personal jurisdiction under Section 302(a)(2) or (a)(3).

### (c)    Plaintiff Has Not Otherwise Argued for the Court's Jurisdiction Based on CGML's Own Conduct

Plaintiff's claim for negligent retention and supervision of Mr. Waters would seem to be predicated on CGML's own conduct rather than that of Mr. Waters.  (FAC ¶¶ 278-285).[9]  Citing *Edwardo II*, 66 F.4th at 75, CGML argues that "any alleged conduct by CGML occurred in the United Kingdom," not in New York.  (Citi Br. 8).  That may defeat personal jurisdiction under Section 302(a)(2), which requires the conduct to take place "within the state."  N.Y. C.P.L.R. § 302(a)(2).  But Section 302(a)(3) separately provides for jurisdiction based on conduct outside of New York if it causes "injury to person or property within the state."  *Id.* § 302(a)(3).  In other words, Plaintiff *could have alleged* facts sufficient to give the Court personal jurisdiction to adjudicate her negligence claim against CGML, regardless of where the conduct took place, because Plaintiff was injured in New York.

However, given the actual allegations in the FAC, that basis for personal jurisdiction remains a theoretical one.  Despite invoking Section 302(a)(3) in the FAC and in her opposition (*see* FAC ¶¶ 24, 27; Pl. Opp. 8), Plaintiff makes no mention of CGML's own negligence or misconduct toward her (*cf.* FAC ¶ 27

---

[9]    The Court acknowledges that aiding and abetting can be a claim of direct liability as well.  However, on that claim, Plaintiff simply alleges that all "Defendants, along with non-party co-conspirator Benjamin Waters, directly participated in the discriminatory conduct and aided and abetted, incited, compelled, and/or coerced the unlawful discriminatory conduct in violation of NYSHRL and NYCHRL."  (FAC ¶ 273).  Without an explanation of CGML's direct aiding and abetting liability, the Court declines to treat the claim as such and assumes that Plaintiff seeks to hold CGML liable for Mr. Waters's aiding and abetting under an imputed theory of liability, which the Court has already addressed in the previous section.

(alleging that CGML "exercised control over [Mr. Waters's] conduct, which was directed at and caused harm in New York")). Nor does Plaintiff discuss any of the elements required to establish jurisdiction under Section 302(a)(3). *See Helio Logistics, Inc.* v. *Mehta*, No. 22 Civ. 10047 (NSR), 2023 WL 21887, at *7 (S.D.N.Y. Jan. 3, 2023) (listing five elements). Rather, Plaintiff treats Sections 302(a)(2) and 302(a)(3) as interchangeable, arguing that jurisdiction is proper under both sections based on the imputation of Mr. Waters's misconduct to CGML. (Pl. Opp. 8). The Court will not read the FAC to include allegations it does not contain about CGML's conduct. *Cf. United States* v. *Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

In sum, the only proper Citi Defendant in this case is CGML, and the facts alleged by Plaintiff are insufficient to give this Court personal jurisdiction over that entity under any of the subsections of New York's long-arm statute. Accordingly, the Court grants the Citi Defendants' motion to dismiss under Rule 12(b)(2).

## 2. Even If the Court Had Jurisdiction to Consider Plaintiff's Negligence Claim Against CGML, the Claim Is Inadequately Pleaded

As noted, in addition to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Citi Defendants have also filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. (Citi Br. 12-19). The Court has already determined that it lacks personal jurisdiction over all of the Citi Defendants, including CGML, which ordinarily would counsel against considering the

merits of Plaintiff's claims against CGML.  *See Oliveras* v. *United States*, 371 F. Supp. 3d 105, 113-14 (S.D.N.Y. 2019) (citing *Cornwell* v. *Credit Suisse Grp.*, 666 F. Supp. 2d 381, 385-86 (S.D.N.Y. 2009) ("[A]bsent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action further." (alteration in original)); *Norex Petroleum Ltd.* v. *Access Indus., Inc.*, 540 F. Supp. 2d 438, 449 (S.D.N.Y. 2007) (dismissal for lack of jurisdiction "moots, and thus terminates, all other pending motions")).

Nevertheless, the personal jurisdictional issues in this case — particularly with respect to N.Y. C.P.L.R. § 302(a)(3) — are "complex," *Carr* v. *DeVos*, 369 F. Supp. 3d 554, 562 (S.D.N.Y. 2019), and the possibility exists "that the Second Circuit could arrive at a conclusion contrary to that espoused by this Court" in its personal jurisdiction analysis, *S.G.* v. *Success Acad. Charter Sch., Inc.*, No. 18 Civ. 2484 (KPF), 2019 WL 1284280, at *16 n.12 (S.D.N.Y. Mar. 20, 2019).  To promote efficiency for the parties, the Court follows the example of other courts in this District and addresses the merits of Plaintiff's negligence claim, the sole claim as to which there is a colorable argument for the Court's personal jurisdiction under Section 302(a)(3).  *See, e.g.*, *Barton* v. *Ne. Transp., Inc.*, No. 21 Civ. 326 (KMK), 2022 WL 203593, at *9 (S.D.N.Y. Jan. 24, 2022); *Cellucci* v. *O'Leary*, No. 19 Civ. 2752 (VEC), 2021 WL 242806, at *5 (S.D.N.Y. Jan. 25, 2021).

### a.    Applicable Law

On a Rule 12(b)(6) motion, the court "draw[s] all reasonable inferences in [the plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true,

and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  A plaintiff is entitled to relief if she alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).  Indeed, a plaintiff must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, her "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

To state a claim for negligent retention and supervision under New York law, "in addition to the standard elements of negligence," a plaintiff must show

> [i] that the tortfeasor and the defendant were in an employee-employer relationship; [ii] that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and, [iii] that the tort was committed on the employer's premises or with the employer's chattels.

*Alsaud*, 12 F. Supp. 3d at 680 (quoting *Biggs*, 2010 WL 4628360, at *9); *see also Moore Charitable Found.* v. *PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (2023) (phrasing third element as whether "the employee engaged in tortious conduct on the employer's premises or using property or resources available to the

employee only through their status as an employee, including intellectual property and confidential information"); *Nickey* v. *City of Mt. Vernon*, 217 N.Y.S.3d 594, 596 (2d Dep't 2024) ("A cause of action for negligent retention requires proof that the employer knew or should have known of the employee's harmful propensities, that it failed to take necessary action, and that this failure proximately caused the plaintiff's injuries." (citations omitted)).  In particular, the knowledge element requires the employer to be "aware of specific prior acts or allegations against the employee."  *Alsaud*, 12 F. Supp. 3d at 680.  "The prior misconduct, moreover, must be of the same kind that caused the injury; general, unrelated or lesser allegations of prior wrongdoing are insufficient."  *Id.* at 681; *see also Doe* v. *Uber Techs., Inc.*, 551 F. Supp. 3d 341, 362 (S.D.N.Y. 2021) ("Such claims require 'specific allegations of the employee's past wrongdoing.'" (quoting *Alsaud*, 12 F. Supp. 3d at 682)).

### b.    Analysis

Focusing on the second element, Plaintiff cites *Charlier* v. *21 Astor Place Condominium*, No. 22 Civ. 5903 (LTS), 2024 WL 4026253 (S.D.N.Y. Sept. 3, 2024), for the proposition that CGML need not have known about Mr. Waters's propensity before he started harassing her.  (Pl. Opp. 11-12).[10]  That is an incorrect statement of the law.  In *Charlier*, a sister court in this District dismissed a negligent *hiring* claim because the plaintiff did not allege sufficient

---

[10]    While the parties do not discuss the third element in their briefs, the Court highly doubts that the FAC has alleged sufficient facts showing that Mr. Waters's conduct was committed on CGML premises or with CGML's chattels.  *See Doe* v. *Alsaud*, 12 F. Supp. 3d 674, 681-82 (S.D.N.Y. 2014).

facts showing that the employer knew about the defendant's propensity before *hiring* him. *Id.* at *8. Unlike a negligent hiring claim, a negligent retention and supervision claim does not require knowledge of a defendant's propensity before hiring. Nevertheless, *Charlier* makes clear that such a claim still requires the employer to be on notice of the defendant's propensity before the misconduct at issue takes place. *Id.* (discussing foreseeability based on prior conduct). Furthermore, the Second Circuit has confirmed that the second element calls for the employer's actual or constructive knowledge of the employee's propensity for misconduct "prior to the injury's occurrence." *Ehrens* v. *Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). In fact, the Second Circuit in *Ehrens* evaluated propensity based on whether the defendant "had ever engaged in, or been accused of engaging in, sexual misconduct" before the relevant incident. *Id.* Put simply, in the negligent retention and supervision context, timing matters.

As CGML points out, the FAC does not allege that CGML knew about Mr. Waters's propensity for sexual harassment before he started harassing Plaintiff. (Citi Reply 9-10). Instead, Plaintiff contends that "multiple personnel and supervisors with the Citi Defendants were aware of Mr. Waters'[s] inappropriate conduct, that management acknowledged the need to remove Mr. Waters from his position but failed to do so, and that [Plaintiff] personally communicated concerns to Mr. Waters'[s] supervisor who indicated that he would address the issues." (Pl. Opp. 9; *see* FAC ¶¶ 93-94 (alleging that Plaintiff and Ms. McCathie reported Mr. Waters to his supervisor at CGML); *id.* ¶¶ 105-108 (alleging that

Mr. Waters's supervisor attempted to remove Mr. Waters from his position and that Mr. Waters's new supervisor was also informed of "problematic issues"); *id.* ¶ 161 (alleging that Plaintiff confided in another Citi trader about "Mr. Waters'[s] horrible treatment of her")).  But Plaintiff's argument misses the point.  Those factual allegations all pertain to Plaintiff's own experience of sexual harassment by Mr. Waters — the conduct at issue in this litigation — and are therefore insufficient to fulfill the requirement of *prior* misconduct.

Moreover, Plaintiff's other allegations outside of her own experience are far too general to put CGML on notice of Mr. Waters's propensity to commit the sexual misconduct alleged here.  *First,* Plaintiff alleges that "Mr. Waters's mistreatment of women was widely known within the industry."  (FAC ¶ 161).  While the Court condemns misogyny in any form, it cannot say that Mr. Waters's general mistreatment of women is sufficient to support his specific propensity to sexually harass women.  *Second*, Plaintiff alleges that Mr. Waters was expelled from an industry event "for inappropriate behavior toward a female broker."  (*Id.* ¶ 118).  But that allegation does not specify whether Mr. Waters sexually harassed the other broker or behaved inappropriately in another way.  Moreover, the incident took place after Mr. Waters had already started harassing Plaintiff.  (*See id.* ¶¶ 117-118).  *Third* and finally, Plaintiff alleges that Mr. Waters frequently asked brokers to procure prostitutes on his behalf.  (*Id.* ¶ 219).  Again, that allegation does not support Mr. Waters's propensity to sexually harass brokers, and the FAC does not allege that Mr. Waters sexually harassed Plaintiff by asking her to procure prostitutes.  As a

result, the Court dismisses Plaintiff's negligent supervision and retention claim because the FAC "falls short of plausibly alleging that . . . [CGML] knew or should have known of [Mr. Waters's] propensity to sexually harass" brokers like Plaintiff. *O'Rear* v. *Diaz*, No. 24 Civ. 1669 (PAE), 2025 WL 283169, at *11 (S.D.N.Y. Jan. 23, 2025).

**B.    The Court Grants TPIGMA's Partial Motion to Dismiss**

**1.    Overview**

Separate from the Citi Defendants, TPIGMA has filed a partial motion to dismiss Plaintiff's ninth and tenth causes of action under Rule 12(b)(6) for failure to state a claim.  (TPIGMA Br. 1).  The same legal standards articulated above for the Citi Defendants' Rule 12(b)(6) motion also apply to the Court's evaluation of Plaintiff's allegations against TPIGMA.

Specifically, Count 9 in the FAC alleges that TPIGMA breached its contractual obligations under the Employment Agreement by

> [p]reventing [Plaintiff] from being able to perform her role; [f]ailing to provide a safe and harassment-free work environment; [f]ailing to properly investigate and address Plaintiff's complaints of harassment and discrimination; [r]etaliating against Plaintiff for reporting harassment and discrimination; [f]ailing to adhere to its own policies and procedures regarding harassment and discrimination; [t]erminating her salary abruptly and with little notice; and [p]resenting [her] with a sham job offer designed to make it appear as if she voluntarily resigned.

(FAC ¶¶ 286-290).  In addition, Count 10 alleges that TPIGMA breached an implied covenant of good faith and fair dealing by

> [p]ressuring Plaintiff to tolerate harassment and inappropriate behavior from clients; [r]etaliating against Plaintiff for reporting harassment and discrimination; [c]onducting a sham investigation designed to outlast Plaintiff rather than address her complaints; [a]ttempting to force Plaintiff's resignation through hostile work conditions; and [m]isrepresenting the nature and availability of alternative positions within the company.

(*Id.* ¶¶ 291-294).  As set forth herein, neither of Plaintiff's contract-based claims survives TPIGMA's motion to dismiss.

### 2.   Plaintiff Has Not Sufficiently Pleaded a Breach-of-Contract Claim

Under New York law, which the parties agree applies in this case,[11] a breach-of-contract claim consists of four elements: "[i] the existence of a contract, [ii] performance of the contract by the plaintiff, [iii] breach by the defendant, and [iv] damages suffered as a result of the breach." *Ebomwonyi* v. *Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020), *aff'd*, No. 20-3344, 2022 WL 274507 (2d Cir. Jan. 31, 2022) (summary order).  At a minimum, the plaintiff must allege at the pleadings stage which terms of the contract the defendant allegedly breached.  *Lan Sang* v. *Ming Hai*, 951 F. Supp. 2d 504, 527 (S.D.N.Y. 2013).  Otherwise, a breach-of-contract claim "will be dismissed where a plaintiff fails to allege 'the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated.'"  *Generation Next Fashions Ltd.* v. *JP Morgan*

---

[11]    (*See* TPIGMA Br. 6 (analyzing Plaintiff's ninth cause of action under New York law); Pl. Opp. 21 (citing New York state court cases to support breach-of-contract claim)).

*Chase Bank, NA*, 698 F. Supp. 3d 663, 673-74 (S.D.N.Y. 2023) (quoting *Fink* v. *Time Warner Cable*, 810 F. Supp. 2d 633, 644-45 (S.D.N.Y. 2011)).

Here, not only has Plaintiff failed to identify the specific contractual terms that TPIGMA allegedly violated, but she has also failed to provide the Court with a copy of the Employment Agreement.  Without the benefit of examining the terms at issue — or the Employment Agreement more broadly — the Court cannot accept as true Plaintiff's "legal conclusion couched as a factual allegation" that the Employment Agreement was breached.  *Iqbal*, 556 U.S. at 679 (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).  Precisely for this reason, courts in this District have explained that "[w]ithout stating which specific terms of the contract have been breached, a complaint fails to provide the defendant with sufficient notice to defend the claim." *Lan Sang*, 951 F. Supp. 2d at 527; *accord Swan Media Grp., Inc.* v. *Staub*, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012) (dismissing a breach-of-contract claim where "the Complaint does not specify which clause of the Agreement Defendant is alleged to have breached or through what actions or inactions").  Because TPIGMA has not received sufficient notice as to which contractual terms it may have breached, it cannot properly defend against this claim.

In her opposition, Plaintiff attempts to resuscitate the claim by arguing that TPIGMA wrongfully terminated her under a fixed-term employment contract through April 1, 2025.  (Pl. Opp. 20-21).  TPIGMA does not deny — and the Court accepts as true — that the Employment Agreement was a fixed-

term contract through a specific date.  (*See* TPIGMA Reply 3-5).  However, nowhere in the FAC has Plaintiff alleged that she was wrongfully terminated. At most, the FAC states that TPIGMA terminated Plaintiff's paid leave "abruptly and with little notice."  (FAC ¶¶ 202, 289; *see* TPIGMA Reply 3).  That is not the same as wrongful termination.  Furthermore, Plaintiff cannot amend her pleadings through her opposition.  *Barshay* v. *Naithani*, No. 20 Civ. 8579 (KPF), 2023 WL 2051170, at *5 (S.D.N.Y. Feb. 16, 2023) ("The law is clear that '[a] complaint cannot be modified by a party's affidavit or by papers filed in response to a dispositive motion to dismiss or for summary judgment.'" (quoting *Streit* v. *Bushnell*, 424 F. Supp. 2d 633, 639 n.3 (S.D.N.Y. 2006)).  For these reasons, the Court dismisses Plaintiff's breach-of-contract claim.

### 3.  Plaintiff's Quasi-Contract Claim Is Duplicative

That leaves Plaintiff's tenth cause of action, for breach of the covenant of good faith and fair dealing.  Significantly, however, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002)).  Therefore, courts in this Circuit are instructed to dismiss the quasi-contract claim "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts."  *Id.*

Plaintiff argues that her quasi-contract claim is not duplicative. (Pl. Opp. 22). Rather, citing this Court's decision in *LCM XXII Ltd.* v. *Serta Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109 (S.D.N.Y. Mar. 29, 2022), she contends that her quasi-contract claim serves as an alternative theory of recovery in case "the Court at a later time decides that the express terms of the employment agreement were not breached." (Pl. Opp. 22). The two lawsuits, however, are not comparable. In *LCM*, the Court allowed a claim for breach of the implied covenant of good faith to proceed to discovery because the plaintiffs brought it as an alternative theory of equitable relief, a theory that was "contingent on the Court's determination that [the defendant's conduct] did not violate the express terms of the Agreement." 2022 WL 953109, at *15; *see also id.* (noting that "when there is a *bona fide* dispute over whether a contract covers the contested issue, a plaintiff may assert a claim for breach of the implied covenant of good faith and fair dealing in the alternative"). In other words, the quasi-contract claim in *LCM* applied, if at all, to the defendant's conduct outside of the contract.

Unlike the plaintiffs in *LCM*, however, Plaintiff in this case has not alleged that TPIGMA engaged in any bad-faith conduct outside of the Employment Agreement, only that TPIGMA "deprived [P]laintiff of the benefits of her fixed-term employment agreement." (Pl. Opp. 22). Indeed, in the FAC, Plaintiff repeats the same conduct — that TPIGMA forced her to work in a discriminatory and harassment-filled work environment; that TPIGMA retaliated against her for reporting the discrimination and harassment; and

38

that TPIGMA attempted to force her resignation — to support both her contract and quasi-contract claims.  (*Compare* FAC ¶ 289, *with id.* ¶ 293).  Critically, Plaintiff does not dispute that her breach-of-contract and quasi-contract claims are based on the same set of factual allegations.  (*See* Pl. Opp. 22).  Because Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is predicated on the same facts as her claim for breach of contract, the Court must dismiss her quasi-contract claim as duplicative.

C.    **The Court Denies Leave to Amend**

In a footnote at the end of her opposition, Plaintiff requests leave to further amend her pleadings "to cure any perceived technical deficiencies" in her claims against TPIGMA.  (Pl. Opp. 22 n.8).  As an initial matter, the Court is aware of the directive in Federal Rule of Civil Procedure 15(a)(2) that courts "should freely give leave [to amend] when justice so requires."  In this case, however, Plaintiff has already amended her complaint once, and has declined several opportunities to amend it a second time after being made aware, at a granular level, of the moving Defendants' contemplated arguments for dismissal.  (*See* Dkt. #52-54, 79, 81; PMC Tr. 11-13, 16, 36-38).  On these facts, the Court is well within its discretion to deny Plaintiff a third attempt to plead viable claims.  *See, e.g., Baines* v. *Nature's Bounty (NY), Inc.*, No. 23-710, 2023 WL 8538172, at *3 (2d Cir. Dec. 11, 2023) (summary order) (finding no abuse of discretion in denying leave to amend where plaintiffs had "already amended their complaint once in the face of a pre-motion letter from Defendants," and then "requested leave to amend again in a single, boilerplate

sentence without specifying what allegations they could add or how amendment would cure any deficiencies"); *Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, No. 19 Civ. 6122 (GHW), 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020).

More importantly, the Court does not believe that further amendment would remedy the pleading and jurisdictional deficiencies in this case. *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Secs., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that futility "has long been held proper" as a basis for denying leave to amend). The Court has no reason to believe, for instance, that Plaintiff could plead facts sufficient to state a single integrated employer that includes all three named Citi entities, or that she could adequately plead discrimination, retaliation, or negligence claims against those entities. And Plaintiff has presented nothing to suggest that she could identify specific terms of the Employment Agreement that TPIGMA allegedly breached or plead facts that could support a separate quasi-contract claim.

For similar reasons, the Court also denies Plaintiff's request for jurisdictional discovery. (*See* Pl. Opp. 8 n.2). Based on the factual allegations in the FAC and Plaintiff's arguments in her opposition, Plaintiff has failed to establish a *prima facie* case for personal jurisdiction. Therefore, it is within this Court's discretion to deny further discovery, especially when Plaintiff has

40

not identified a "genuine issue of jurisdictional fact" that may warrant such discovery. *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 402 (S.D.N.Y. 2009) (quoting *Daventree Ltd.* v. *Republic of Azer.*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004)).

## CONCLUSION

For the foregoing reasons, the Citi Defendants' motion to dismiss is GRANTED, and TPIGMA's partial motion to dismiss Plaintiff's ninth and tenth causes of action is also GRANTED. Ms. McCathie and ICAP Group Services are directed to answer Plaintiff's FAC on or before **October 13, 2025**. The remaining parties are hereby ordered to meet and confer on the remaining claims and submit a proposed case management plan on or before **October 20, 2025**.

The Clerk of Court is directed to terminate the pending motions at docket entries 93 and 96, and to modify the caption as reflected above.

SO ORDERED.

Dated:    September 29, 2025
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge